AUGUST INGWERSEN, Appellee, v. CARR & BRANNON et al., Appellants.

**EVIDENCE:** Opinion Evidence—Hypothetical Questions—Referring
1 Witness to Record. A hypothetical question which, in *part* and in an *inferential* way, assumes knowledge on the part of an expert witness of the condition of the record as bearing on certain material facts, without detail of such facts, is not necessarily subject to the vice of turning the witness loose to give an opinion *upon all the evidence in the record.* Especially is this true when the answer elicited was but a repetition of another answer formerly given without objection.

**EVIDENCE:** Opinion Evidence—Hypothetical Question—Improper
2 Assumption of Fact. A hypothetical question so framed as to require the expert witness to base his opinion upon what he *re-members* of the testimony of another witness on a certain point is not necessarily a prejudicial way of assuming the facts when the facts thus sought to be injected into the question are undisputed.

**EVIDENCE:** Relevancy, Competency and Materiality—Symptoms of Injury. A physician, from a personal examination of an injured person, may testify, when relevant to the issues, that he did or did not find symptoms of a certain injury.

**EVIDENCE:** Documentary Evidence—Medical Works—Medical and Surgical Teachings. Medical works being, as a general rule, inadmissible, it follows that oral testimony of what such works teach is equally improper, whether brought out on direct, redirect or cross-examination.

**APPEAL AND ERROR:** Parties Entitled to Allege Error—Complainant as First Offender. The fact that he who alleges error was the first offender in the matter complained of is a quite persuasive reason why the error, if any, should be disregarded. So held where complaint was made of a ruling allowing evidence of the teachings of medical works.

**TRIAL:** Instructions—Province of Court and Jury—Hypothetical Questions—Jury Determining Materialty of Facts. An instruction which permits a jury to determine the materiality of the facts assumed in a hypothetical question, preliminary to determining the value of the opinion expressed thereon, is prejudicial error.

PRESTON, J., dissents on present record.

**WITNESSES:** Examination—Leading and Suggestive Question. The question "State whether or not you exercised your best skill and knowledge in the treatment of this case," is neither leading nor suggestive.

**PHYSICIANS AND SURGEONS:** Malpractice—Negligence—Exercise of Skill, Etc.—Evidence. A physician or surgeon sued for malpractice should be permitted to testify that he exercised his best skill and knowledge in the treatment of the patient.

**PHYSICIANS AND SURGEONS:** Malpractice—Negligence—Failure to Utilize Means at Hand—Evidence. Evidence is admissible, in an action for malpractice, that an X-ray machine was kept in the town where the defendant practiced, and that the use of the same was available to defendant, in connection with evidence that the use of such a machine was the only means by which the condition of the patient with respect to the matter at issue could be determined with certainty.

*Appeal from ' Crawford District Court.*—F. M. POWERS, Judge..

SATURDAY, SEPTEMBER 22, 1917.

THIS is an action at law against defendants as copartners practicing medicine and surgery, for damages for malpractice. Trial to a jury. Verdict and judgment for plaintiff. Defendants appeal.—*Reversed and remanded.*

*Dutcher, Davis & Hambrecht* and *J. P. Connor,* for appellants.

*Evans & Evans* and *Harding & Kahler,* for appellee.

PRESTON, J.—The petition alleges that, about July 15, 1912, plaintiff sustained a fracture of his left arm, the humerus being broken at the juncture of the upper and middle thirds, the broken ends of the bone being so separated and not in apposition that the musculospiral nerve was drawn in between said pieces of bone; that defendants were called and plaintiff continued under their treatment until about September 7, 1912, at which time defendants abandoned his case; that plaintiff has lost 17 months' time, has suffered severe pain and mental anguish, has incurred hospital bills and surgeons' fees, his left arm hangs useless at his side, and he is permanently crippled; that defendants were guilty of negligence in the following particulars: (1) In failing to find out that said nerve was caught between the broken ends of the bone before bandaging the fracture on the first trip; (2) in leaving said nerve caught between the broken ends of the bone; (3) in failing to remove the nerve from between the said ends of bone; (4) in failing to bring said ends of bone into direct apposition with each other; (5) in applying a permanent dressing to the fracture before they knew whether or not said nerve was caught between the broken ends. The errors assigned, of which there are 24, relate for the most part to the rulings of the

trial court upon objections to testimony, although it is also claimed that the verdict was contrary to Instruction 14 given by the court, and that the court erred in refusing an instruction offered by defendants, and that the instruction in regard to hypothetical questions is erroneous.   The record is voluminous, and to notice in detail all the assignments would extend the opinion unduly.   We shall therefore notice the more important propositions and those which seem to be controlling, and refer more briefly to such others as seem to require it.

A brief statement of the facts which are either established or which the jury could have so found, may be helpful.   On July 15, 1912, plaintiff, a farmer, about 61 years of age, was plowing corn.   One of the horses became frightened and began kicking and started to turn around.   Plaintiff had the lines around his back.   The exact manner in which plaintiff received his injury is not known, but in some manner he was thrown down and lost consciousness. When he came to, he discovered he was injured in his left arm.   Dr. Brannon was sent for and arrived at plaintiff's home about 11 o'clock in the forenoon.   Upon examination, he found plaintiff suffering severe pain, and correctly diagnosed the injury as a fracture of the left humerus near the upper part.   The fracture was oblique, and parallel, or substantially so, with the musculospiral groove in which rests the nerve of that name.   This nerve supplies all of the extensor muscles of the forearm, wrist and hand. There is evidence that this nerve comes from the brachial plexus in the arm pit, is about the size of a goose quill, and is in a groove which winds partly around the humerus; that a portion of the fracture involved the groove; that this nerve is frequently injured in fracture of the humerus; that injury to that nerve interferes with the action of the muscles it supplies.   Upon reaching plaintiff's house, according to plaintiff's testimony, Dr. Brannon told plaintiff and

his daughter that the arm was broken. Plaintiff thought not, and showed the doctor how he could extend his fingers. The doctor gave an anæsthetic, and to show plaintiff's daughter where the break was, he raised the arm on a level with the shoulder, then straightened out the arm, and applied splints and a bandage. Evidence for defendants tends to show that, when plaintiff was put under an anæsthetic, crepitus was obtained, the fracture reduced, temporary splints applied, and the forearm and hand placed in a sling and the arm encased in a muslin swath extending around plaintiff's body. The next day, the temporary splints were replaced with permanent ones. The next day, or upon the third visit by Dr. Brannon, it was found that there was an absence of sensation in the fingers and that plaintiff could not move them. September 7th, plaintiff went to Dr. Leytze in Sioux City. An X-ray was made to assist in diagnosis. A few days later, Dr. Leytze cut down on the fracture and found the musculospiral nerve, and some muscle, between the two ends of bone. The fracture was ununited. He took the nerve out and relieved the pressure, and then fastened the pieces of bone together with an iron plate. He did not suture the nerve, but left it for nature to restore. Dr. Leytze says that the greatest distance between the ends of the bone was one-half inch. Defendants contend that plaintiff had two injuries—the fractured humerus and an injury to the nerves. There is evidence that the proper treatment of this fracture was the closed, or conservative, treatment, which the defendants followed, and that without an open operation there is no way a physician can determine the seat of the injury to the nerve. Injuries to the nerves may show a fracture of the humerus. The symptom of the nerve injury is the resulting paralysis of the muscles, if a motor nerve is injured, and a resulting loss of sensation if a sensory nerve is injured. The seat of the injury to the nerve may be at any

place between the origin of the nerve, and the spinal nerve and its distal end. Injury to the nerve causing paralysis or loss of sensation may be any one of the following: contusion, laceration, pressure, severing, or stretching.

Defendants say that they treated the fractured humerus and treated the nerve expectantly,—that is, they waited to give nature a chance to clear up the paralysis without surgical interference, relying upon nature to clear up the injury to the nerve,—and say that, if nature does not clear it up, and surgical interference is necessary, that the delay of two or three months occasioned by the expectant method does not prejudice a surgical operation. Defendants argue that the case centers about the discovery by Dr. Leytze of the musculospiral nerve between the broken ends of the bone.

I. Plaintiff's theory is that the oblique fracture of the humerus involved the musculospiral groove, containing the nerve, and that, when defendant manipulated the arm, and bent it at the point where it was broken, the nerve slipped in and was caught when the two pieces of bone closed up, and that it was negligence to fail to find out that the nerve was caught before he applied the splint and bandages on his first trip, which he should have done by getting crepitus, and that he could have gently manipulated the bone so that he could have felt a grating of the ends together; that this would have proved to him that nothing was between the ends; but that the absence of crepitus, and later the lack of sensation, would have told him that the nerve was caught; that, even though defendants at first obtained crepitus, the manipulation of the arm in the manner described caused the nerve thereafter to slip in between the ends of the broken bone; that it was negligence to leave the nerve caught when it could have been removed by extension and counter extension. They say, too, that it was negligence not to bring the ends of the bone in direct apposi-

tion, and that the manipulation necessary to bring the ends
directly together would have disclosed the absence of crep-
itus; also that defendants were guilty of continuing negli-
gence in the treatment of plaintiff, in failing to find that the
nerve was caught by testing plaintiff's ability to use the
muscles supplied by this nerve, and by noting the condition
as to sensation, or lack of it, in the skin area, and in fail-
ing to remove the nerve during the first few days by ex-
tension and counter extension, and later by a cutting oper-
ation.   They contend that defendants failed in all these
particulars, and that the nerve was pinched to death be-
tween the ends of the bone.

Defendants say that this theory is not supported by
the evidence, and that other nerves were injured; that Dr.
Leytze says that he does not know whether other nerves
were injured or not.   The defendants contend that the ver-
dict is contrary to Instruction No. 14, given by the court,
which reads:

"The plaintiff alleges in his petition that the musculo-
spiral nerve was caught between the ends of the broken bone
before defendant treated the same, and unless you find by a
preponderance of the evidence that the musculospiral nerve
was caught between the ends of the broken bone before or
at the time the defendant, Brannon, attempted to set and
treat same, plaintiff cannot recover."

As said, defendants contend that the case centers
about the discovery by Dr. Leytze, in September, of the
nerve between the broken ends of the bone, and they say
that the fact that the nerve was between the broken frag-
ments of the bone in September, when Dr. Leytze performed
the operation, does not tend to prove it was there two
months before, when the arm was first dressed by the de-
fendants, and that presumptions do not relate backward,
citing *Adams v. Junger*, 158 Iowa 449, 458.   But in that
case, the only proof which plaintiff had was the condition

found at the later date, when an X-ray examination was made, and it was shown by the evidence that this in itself is no proof of the condition at the time the injury was first received. But we think that in the instant case there were other circumstances, some of which have been enumerated, tending to show, and from which the jury could have found, that the nerve was caught prior to or at the time of defendants' first visit. We shall not repeat the evidence tending to so show. There was a conflict in the testimony which made this a jury question. What we have just said disposes of the assignments of error wherein it is thought that the court erred in submitting the first and fifth specifications of negligence.

1. EVIDENCE: opinion evidence: hypothetical questions: referring witness to record.

II.    In some of the assignments of error, complaint is made that expert witnesses were allowed to base their answers upon hypothetical questions which did not assume the facts, but made reference to all the evidence in the case. The witness Dr. Ross, testifying on the subject of how long it would take lymph to harden into bone, was asked the following question:

"Q.    In a case of a man such as the plaintiff, 61 years of age, and of previous good health, in a person such as the plaintiff was in July, 1912, as shown by the evidence in this case, about how long would it take in this case?" (Objected to as incompetent, irrelevant, and immaterial, and assuming evidence not in this record, and I am interpreting the evidence as I remember it. Overruled.) A. Four and one-half or five weeks, everything being equal."

It is doubtful whether the objection made raises the question now argued. We have repeatedly held that the objection "incompetent, irrelevant, and immaterial" is not sufficiently specific, where the objection is overruled, to raise any question for review; that it must be stated wherein the question is incompetent, irrelevant, or immaterial.

The only claim that could be made that the objection does state wherein the question is so is that it assumes evidence not in this record. It is not quite fair to the trial court or to litigants, to single out a single question in a long examination of a witness without taking into consideration the entire situation. In the instant case, Dr. Ross had been examined at great length before the question now being considered was asked. Thirty pages of the abstract are taken up with his testimony prior to that time. A hypothetical question taking up three pages of the printed abstract had been propounded to him, which begins:

"Q. In the case of a man of the size and general appearance of the plaintiff in this action, of about 60 years of age," etc.

Then follow the facts which plaintiff claims, and the court ruled, had been properly shown. Appellants assume that the question just set out requires the witness to base his opinion upon all the evidence in the case; and the cases cited, or many of them, are cases wherein witnesses were asked to give their opinion based upon all the evidence in the case, or upon all the evidence of a witness which the expert witness had heard, or similar situations. But we think the question here was not so broad. A fair interpretation of the question is that the phrase "as shown by the evidence in the case" refers to plaintiff's age and previous good health as the evidence shows he was in July, 1912. Appellants cite, among other cases on this proposition, *Manufacturers' Accident Indemnity Co. v. Dorgan,* 58 Fed. 945, 949; *People v. McElvaine,* (N. Y.) 24 N. E. 465; *Hoener v. Koch,* 84 Ill. 408; 5 Encyc. of Ev. 618, 619; and the following Iowa cases: *Smith v. Hickenbottom,* 57 Iowa 738; *State v. Watson,* 81 Iowa 380. In one of the foregoing cases, a witness was asked to give his opinion based upon all the testimony, etc. Another was asked to take all the facts as he understood them. It is true, of course, as con-

tended by appellants, that the jury are entitled to know the facts upon which a witness bases his opinion, and it is not proper for a witness to base an opinion upon his memory of what the evidence was, or to trench upon the province of the jury, and to determine what facts are established. As said in the *Watson* case, supra, where the facts upon which the opinion is to be based are in dispute, the hypothetical form of question should be used. In that case it was held that there was no error in overruling the objection, because the testimony of the witness who described conditions was undisputed. Furthermore, Dr. Ross had already testified, and without objection, that the lymph thrown out in the reparatory process would harden to the consistency of gristle in about three weeks, in a young person, and in an old person, five weeks, before it is safe to turn it loose, which is substantially the same as his answer to the question now under consideration. It is quite clear to us that no prejudice could have resulted from this answer.

2. EVIDENCE: opinion evidence: hypothetical question: improper assumption of fact.

III. The third assignment relates to the same matter, and is argued with the other. It refers to another question asked the same witness, Dr. Ross. The record as to this is as follows:

"Q.   Do you have in mind or remember his statement as to the character of manipulation made by him in his examination of Mr. Ingwersen's arm by him in his office on September 9 and September 11, 1912?   (Mr. Dutcher:   Objected to as incompetent, irrelevant, and immaterial, whether he knows or not, not the proper way to assume the facts for the purpose of the question. The Court:   Overruled. Defendant excepts.)   Q.   In a case of a patient such as Mr. Ingwersen, the plaintiff, and who received an injury such as is stated in the previous hypothetical question, and who on the 9th day of September and on the 11th day of September, 1912, was examined by Dr. Leytze, stripped on

both occasions and the arm manipulated, would there be any chance or liability that the musculospiral nerve would be caught between the two fragments of the bone because of these manipulations? (Judge Connor: Objected to as speculative and argumentative, and assuming a fact not shown by the evidence. The Court: Overruled. Defendant excepts.) A. I do not think there would be any chance, because it would have practically all that time for nature to make the provisional callous, and I do not see how it could get in there."

The complaint here is as to the first part of the question, as to whether witness had in mind or remembered Dr. Leytze's statement as to the character of manipulation made by him. It is not quite clear whether the examiner intended to waive the first part of the question and frame a new one by the latter part, or whether it was intended as a modification of the first part of the question. The answer is responsive and pertinent to the latter part as a complete question. In this latter part of the question, reference is made to the arm's being manipulated. This question was also propounded after the hypothetical question had been asked and answered by this witness. The hypothetical question referred to the examination and manipulation of Dr. Leytze; furthermore, Dr. Leytze described the manipulation, and his evidence as to what he did in that respect seems to be undisputed. The answer being now considered shows that Dr. Ross did not think the nerve could get in between the ends of the bone at the time Dr. Leytze examined and manipulated the arm, because the callous around the ends of the broken bone would prevent it. This would be true regardless of the character of Dr. Leytze's manipulations, unless the bones were then again broken apart. We do not understand appellants to claim that this was done, at least not until the cutting in operation was had after the manipulations.

IV. Another question argued in the same connection is in regard to the following question:

3. EVIDENCE: relevancy, competency and materiality: symptoms of injury.

"Q. In a case such as the case of the plaintiff in this action, are there any symptoms that the arm, muscles or nerves were stretched to the extent of causing the paralysis to all of the extensor muscles, and of causing the loss of sensibility which has existed in the plaintiff's arm up to this time? (The same objection was made, and for the further reasons that it assumes facts that are not shown. Overruled.) A. There are no symptoms of that kind present."

The prior objection was, "Incompetent, irrelevant, immaterial, and not rebuttal, and that the opinion is asked that are assumed in the question." The discussion at this point between counsel and the court was whether the evidence was rebuttal. Defendants claimed that plaintiff's condition as to the injury to the nerve and loss of sensation were from other causes than that claimed by plaintiff, such as that the nerve had been cut or stretched. The answer is based upon what Dr. Ross learned from examination of plaintiff and tests performed by him at a former time, and he says he found the condition about the same at the trial.

As before stated, the record is voluminous, and the medical witnesses were examined at great length and minutely, and the matters were gone over again and again upon different theories of the medical witnesses and of counsel. Those having had experience in the trial of such cases know, we think it is safe to say, that questions are often framed, particularly in the later stages of a long trial, with reference to what has gone before, and in such a situation, the witness, the court, and counsel understand, generally at least, the purpose of the question, and what particular theory, or phase of the evidence which has been

introduced, is sought to be met. A question standing by itself may not be clear.

4. EVIDENCE: doc-
umentary evi-
dence: medical
works: medical
and surgical
teachings.

V. Errors 4, 11, and 13 may be considered together. They relate to questions asked medical experts as to what medical authorities teach. Appellants' proposition is that it is not competent to ask an expert, in the examination in chief, what the medical authorities teach on a given point. One of plaintiff's medical witnesses was asked on a re-examination the following:

"Q. I will ask you whether or not you know what is the result of a given number of operations performed in this way as reported either by members of the medical profession through journals, text books or in any other way, giving a table of results in a given number of cases operated upon, whether sutured or pressed upon or wounded so as to make the suturing operation necessary. (Mr. Dutcher: The same objection, the objection being that the question is incompetent, irrelevant and immaterial for the reason that it doesn't appear that the doctor knows; he says that it is something he has heard somebody else say. The Court: Overruled. Defendant excepts.) A. I do. Q. You may state the result of said operations. (Mr. Dutcher: The same objection. The Court: Overruled. Defendant excepts.) A. In 80 cases operated upon, statistics compiled show that there are 30 recoveries. Mr. Dutcher: You are quoting now statistics that you got out of a book? A. Yes, sir. (Mr. Dutcher: Move to strike out the answer as incompetent and hearsay and not the best evidence. Mr. Evans: We certainly have a right to show statistics from any source in the medical profession. The Court: If as a matter of fact this witness read the text books himself and gained his knowledge in that way, he would be competent to tell. Defendant excepts.) A. The text books of surgeons, aided by Dr. Bevin, give 80 cases of suture, run-

ning from 11 to 48 years; 30 of them were successful, 34 of them were improved to a certain extent, and 16 were failures. The failures were in·elderly persons. (Mr. Dutcher: Move to strike out the answer as incompetent, irrelevant and immaterial, and hearsay and not the best evidence. The Court: Overruled. Defendant excepts.)"

Dr. Fairchild, a witness for the defendant, after he had given testimony comprising 24 pages of the abstract, 15 of which were on direct examination by defendant, was asked, on cross-examination, this question:

"Q. I will ask you this question, Doctor: Isn't it a fact that it is recognized generally by medical and surgical authorities, and so stated in all of the standard works along this line, that the danger of the musculospiral nerve becoming involved in between the fragments is one of the dangers of a fracture of the surgical neck of the humerus? (Mr. Dutcher: Objected to as incompetent, irrelevant, and not the best evidence and not cross-examination. The Court: Overruled. Defendant excepts.) A. In case of great violence, the fragments of the bone might injure or do damage to the musculospiral nerve. Q. But in case that the nerve does become involved between the two ends of the fracture bone, isn't it true that all of the medical authorities agree that that is one of the frequent causes of nonunion? (Mr. Dutcher: The same objection. The Court: Overruled. Defendant excepts.) A. Yes, sir, where violence affects soft tissues along down the bone, but I do not remember of seeing where the musculospiral nerve alone got in there."

Dr. Carr, a·witness for defendant, was asked on cross-examination:

"Q. Do not all of the medical authorities, the standard medical authorities and surgical authorities, teach you that there is grave danger, in a fracture located where this fracture was located, of the musculospiral nerve being

caught between the fragments of the bone—don't the authorities so hold? (Mr. Dutcher: Objected to as an incompetent attempt to get hearsay evidence before the jury, and not cross-examination. The Court: Overruled. Defendant excepts.) A. There is danger of the musculospiral nerve being caught lower down, hardly possible to be caught up there. Q. And do not all the standard authorities so hold? (Mr. Dutcher: The same objection. The Court: Overruled. Defendant excepts.) A. They hold that there is risk of the musculospiral nerve being caught."

It will be observed that some of these questions were asked on re-examination of plaintiff's witnesses, others were cross-examination of defendants' witnesses, and none of them in chief, as contended by appellants. Appellants cite *Etzkorn v. Oelwein,* 142 Iowa 107, *Bixby v. Omaha & C. B. R. & B. Co.,* 105 Iowa 293, *State v. Peterson,* 110 Iowa 647, 2 Encyc. of Ev. 589, *State v. Blackburn,* 136 Iowa 743, 747. to the proposition that medical works are not admissible in evidence. That this is the general rule, there is no doubt, but there are some exceptions. It may be that a medical witness giving an opinion based upon his reading, rather than his personal experience, might be asked, on cross-examination, in regard to the teachings of the authorities. to test the accuracy of the witness' knowledge; or, should such a witness refer to a particular authority as sustaining his theory, such authority might be used as impeaching, if it should turn out that the authority did not sustain the theory of the witness; or if opposing counsel, on cross-examination, should proceed along a certain line, referring to medical authorities, the door might be opened for re-examination in regard to medical books. There may be other exceptions. Appellants also cite *State v. Winter,* 72 Iowa 627–632, to the point that it is not competent to ask a physician, as an expert, in the examination in chief, what

the medical authorities teach on a given point. In that case it was said:

"It would be admissible, perhaps, on the cross-examination of a medical expert, to inquire of him as to the teachings of the authorities in his profession. The object of such examination, however, would be to test the accuracy of the expert's knowledge. But the question in this case was asked, not with this in view, but for the purpose of proving that the theory in question is taught by the authorities."

It was also said in that case, at page 632:

"But the works themselves were admissible in evidence, and they are the only competent evidence of what they teach."

This last is contrary to the later holdings. The three questions now under consideration standing by themselves would be improper, and we are inclined to think that the trial court did not hold the examination in regard to medical books as close to the rule as it should. As already stated, there was a large number of medical witnesses testifying in this case, and the examination was at great length, as to some of them at least. It should be said that the record shows that, prior to the time the three questions now under consideration were propounded, defendants had, in a large number of instances, propounded similar questions. One of these was in defendants' cross-examination of Doctors Leytze and Ross, early in the trial, and, so far as we are able to discover, defendants were the first to start this line of inquiry. Others were in the direct examination of at least three of defendants' own witnesses. Two or three of such questions will be given as illustrations. Dr. Leytze was asked by defendants:

5. APPEAL AND ERROR: parties entitled to allege error: complainant as first offender.

"Q. Isn't it true that high medical authority pro-

claims that the operation can better be performed after a couple of months than before?"

·Again, in the cross-examination of Dr. Ross, defendants' counsel asked:

"And it is the judgment of surgeons in excellent standing in your profession, specialists along this line, that you are justified in waiting for months before you perform an operation to determine whether the nerve will clear itself up or not or paralyze?"

Dr. Rowse, defendants' witness, testified on direct examination:

"There is a case on record that was restored after paralysis of 26 years, and the authorities teach us that, if a severed nerve is sutured two or three years afterwards, the nerve regenerates."

Again, one of the defendants testified that he read up on the authorities, and was asked by his counsel, "Q. Do the authorities you have consulted confirm your judgment?"

And so on. The record does not show that plaintiff objected to these questions put by defendants, as perhaps he should have done. The record shows that no effort was made by plaintiff to introduce medical works in evidence or to read from them. Plaintiff cites *Cronk v. Wabash R. Co.*, 123 Iowa 349; *State v. Donovan*, 128 Iowa 44; *Hutchinson v. State*, 19 Neb. 262; Underhill on Ev., page 274.

While,. as ·said, the trial court may not have held as closely to the rule in all cases as it should, we would not, under the circumstances, reverse because of the rulings on the three objections now under consideration. Since the case must be reversed on other grounds, doubtless on a retrial the rule will be more strictly observed.

6. TRIAL: instructions: province of court and jury: hypothetical questions: jury determining materiality of facts. Another error assigned is that the jury should not be permitted to determine the materiality of certain assumed facts incorporated in hypothetical questions, and that the materiality of such facts is a question

to be determined by the court. In this connection, Instruction No. 20 is complained of. It is as follows:

"XX. Certain questions have been propounded to witnesses which are known as hypothetical questions, and the testimony of the witnesses, in some instances in this case, is based upon such hypothetical questions, or upon facts assumed for the purposes of the trial, and presented in some other form. And you are instructed in this connection that you are not to take for granted that the statements contained in the hypothetical questions which have been propounded to the witnesses are true. Upon the contrary, you are to carefully scrutinize the evidence, and from the evidence determine what, if any, of the averments are true. Should you find from the evidence that some of the material statements therein contained are not correct, and they are of such a character as to entirely destroy the reliability of opinions based upon the hypothesis stated, you may attach no weight whatever to the opinion based thereon: you are to determine from all the evidence in the case what the real facts are, and whether or not they are correctly stated in the hypothetical question or questions. I need hardly remind you (for it will suggest itself to your minds) that an opinion based upon an hypothesis wholly incorrectly assumed, or incorrect in its material facts, and to such an extent as to impair the value of the opinion, is of little or no value."

The complaint is as stated in the error assigned, which has just been referred to. Appellants cite, as holding that the instruction is erroneous, *Stanley v. Taylor,* 160 Iowa 427, at 430; *Burk v. Reese,* 143 Iowa 498; *Ball v. Skinner,* 134 Iowa 298, at 310.

Following these cases and others, the majority are of opinion that the instruction in the instant case is erroneous, and that the case must be reversed for that reason. For myself, I am inclined to think that the rule as laid

down in some of the later cases is too technical, and I would be inclined to affirm, so far as the objection now made to this instruction is concerned. In *Stutsman v. Sharpless*, 125 Iowa 342, we said:

"It will not do to allow juries to say what facts were material in securing the opinion of the medical expert, and to what extent a variance would have changed his opinion. The only safe rule is to reject the opinion unless the facts hypothetically stated are established by the evidence. If a portion of the facts are to be eliminated, the witness, and not the jury, should be permitted to estimate the difference this change would effect in the opinion he has expressed."

And in *Ball v. Skinner*, 134 Iowa, at 310, it was held that the materiality of the facts is a matter for the court alone, and the jury is bound to assume that any fact or circumstance allowed in evidence by the trial court is material and entitled to consideration. Substantially the same thing has been said in other cases. This must mean, it seems to me, that every fact assumed in the hypothetical question must be found by the jury to have been established by the evidence, else no weight whatever shall be given to the opinion of the witness. In the instant case, the trial court twice held that evidence contained in the hypothetical question was material; first, by permitting the different witnesses to testify to the different circumstances, and again in permitting the hypothetical question containing all such matters to be answered. Appellants objected to the hypothetical question on the grounds, among others, that it was immaterial, and that it stated facts of which there was no evidence.

I concede that every fact which is really material and upon which the expert bases his opinion should be proved. And yet everyone with experience in such matters knows that, in actual practice, scarcely a single hypothetical ques-

tion is ever propounded that does not contain some matters
which are really not material at all, and that a jury ex-
ercising their common sense would know that. Much de-
pends upon the skill, accuracy and care of counsel in fram-
ing their hypothetical question. To tell a jury in an in-
struction that every fact in a hypothetical question must
be proved exactly as put, would, in every case, if followed
by the jury, result in the jury's disregarding the opinion
of every expert witness. In every case of this kind there
are a few really important and material questions. The
jury are informed of these at the commencement, in the
opening statements, and the case is developed by the evid-
ence with these questions in view, the attorneys on either
side argue these questions to the jury, and the court in-
structs upon them. Many matters creep in which are
merely preliminary and explanatory of these main facts.
In the instant case, one of the hypothetical questions con-
tains matters such as these: It assumes that, when plain-
tiff was examined and operated upon by Dr. Leytze in
Sioux City, he, plaintiff, was stripped to the waist; and such
is the evidence. But suppose the hypothetical question
read as stated, and the proof showed that plaintiff was
stripped to his feet, what possible difference could that make
when the examination made was as to plaintiff's arm? In
such a case, could it possibly make any difference in the
opinion of a medical witness, and for such a variance
should the jury be told that no weight whatever should be
given to the opinion of the expert, or should they be allowed
to use their common sense? Again, one of the hypothet-
ical questions assumes that the pieces of shingle, which
were used as splints, were about two inches wide by about
six inches long. Suppose the evidence was that they were
about three inches wide and seven inches long. Appellants
concede in argument that no complaint is made of the
splints. Should such a variance, which, under the cir-

cumstances, could not be material, either to the surgeon basing his opinion thereon or in the consideration thereof by the jury, have the effect to destroy the opinion of the witness? From the numerous conflicting decisions on this question, I am unable to see how it is possible for a trial court to frame an instruction that would be any help to the jury, and that there is nothing to do but to simply say, in so many words, that everything stated in the hypothetical question is material and must be proved as put, and if it is not so proved, the jury will not give any weight to the opinion of the expert. I shall refer to some of our cases, but not attempt to review all, or any considerable number of them. In *Howe v. Richards,* 112 Iowa 220, at 231, a number of instructions were referred to, and in one of them, referring to hypothetical questions to experts, it was said that the court instructed to the effect that, unless the hypothesis was established in each *material* and *important* part, no weight should be given to the opinion of the witness. The opinion states that the instructions as a whole were a clear, concise, correct, and logical submission of the law of the case. This case is not referred to in the later cases and has not been expressly overruled, so far as I am able to find. In *State v. Watson,* 81 Iowa 380, 385, the jury were instructed that, to render opinions of physicians based on hypothetical questions of any value, all the *material* facts embraced in the question must have been established, and so forth. The case was affirmed, the court saying that the instruction was correct, and that, if defendant desired an instruction more specific as to the facts, he should have asked for it. In *Kirsher v. Kirsher,* 120 Iowa 337, 342, the jury were told that, if they found that such statements of facts are in material and important parts incorrect, unfair, partial, and untrue, then they should attach little or no weight to such testimony. The court said the instruction would

have 'been unobjectionable had the court said that the answers or opinions are of no value.   In *Bever v. Spangler*, 93 Iowa 576, at 603, Mr. Justice Deemer, speaking for the court, said:

"It is also contended that many of the facts assumed in the hypothetical question are irrelevant and immaterial and have no tendency to establish unsoundness of mind. No doubt many of these circumstances, in and of themselves, had no direct tendency to show insanity.   But they were a part of the testator's history, and, when taken in connection with the other circumstances, were proper to be considered as showing his condition of mind."

This but confirms, 1 think, my statement that usually some of the facts in a hypothetical question are not really material, and yet are preliminary or explanatory.   In the same case, at page 610, it appears that an instruction was asked and refused to this effect:

"Where medical expert testimony is received, based upon a purely hypothetical statement of facts,  *  *  *  if it turns out that such hypothetical statement of facts is, in material and in important particulars, incorrect, unfair partial, and untrue, a jury in such case should attach no weight whatever to the answers," etc.

Of this instruction the court said, "That the instruction asked presented a correct rule of law there can be no doubt," and cited *In re Will of Norman*, 72 Iowa 84, 88; *Hall v. Rankin*, 87 Iowa 261.   In passing, it may be remarked that, in my opinion, in many cases the hypothetical questions are unfair and partial—shaded by stating the facts as strong as the strongest witness puts it, and by omitting some of the unfavorable circumstances.   I shall refer to this again in a moment, in a further reference to the *Hessenius* case.   I understand the rule is supposed to be that all of the facts must be fairly stated.   The question in the *Bever* case was as to whether it was reversible

error to refuse the instruction. In the *Bever* case, at 611, the court quoted from another case, in regard to another feature of the instruction, however, that the court must trust somewhat to the common sense of jurors. That remark applies, as before stated, to questions of the character being now discussed.

In *State v. Hessenius*, 165 Iowa 415, the court instructed that, before the jury could give any weight whatever to expert testimony, they must first find, from the evidence, that the facts upon which it is based are substantially true. The instruction was approved, and the words "substantially" and "materially" distinguished. It appears to me that there is but little difference; that is, that the two words would impress a jury in about the same way. Under such an instruction as was approved in the *Hessenius* case, the jury could well find that some of the minor matters contained in the hypothetical question had not been established, and yet give weight to the opinions of the experts. It was further said in that case:

"A recitation of the evidence in a question to an expert witness may include all that has bearing upon the case, it may include that which has not been proven, or it may omit some parts which should be included. The instruction did no more than to tell the jury that all that which served as a basis for the question must be substantially true or proven," etc.

It seems to me that this leaves some of these matters to the jury just as much as though the words "material" and "important" had been used, instead of "substantial" or "substantially." In the instruction now being considered, the jury were told that they were not to take for granted that the statements contained in the questions are true, but that they should carefully scrutinize the evidence and determine what, if any, averments are true, and that, if the jury should find that some of the material

statements are not correct, and of such a character as to entirely destroy the reliability of opinions based upon the hypothesis stated, the jury may attach no weight.  The use of the word "may" may be objectionable, because the jury should have been told directly that, under such circumstances, they should give no weight to such opinions; but that question is not raised on this appeal.  In the last clause, the instruction reads that an opinion based upon a hypothesis wholly incorrectly assumed, or incorrect in its material facts to such an extent as to impair the value of the opinion, is of little or no value.  The use of the word "wholly" and the statement that the opinion would be of little value, may be objectionable, but these matters are not argued.  But it seems to me that the thought of this last clause (that is, that, if the hypothesis is incorrectly assumed, and to such an extent as to impair the value of the opinion, it is of little or no value) is correct, and would allow the jury to disregard minor, unsubstantial, and immaterial matters, which I have tried to show are often included in hypothetical questions.  As stated, this instruction may be objectionable on other grounds, but, in so far as the use of the word "material" therein is concerned,—and that is the objection now made,—it seems to me that there is no reversible error; but I am outnumbered, and the majority are of the opinion that the case should be reversed because of this instruction.

VII.  Dr. Brannon, the member of defendant firm who performed most of the services in the treatment of plaintiff, was asked:

7. WITNESSES: examination: leading and suggestive question.

"Q.  Doctor, what do you say so far as your connection with this case was concerned that the best of your professional ability was brought to bear upon the case?  Q.  State whether or not you exercised your best skill and knowledge in the treatment of this case.  Q.

What is the fact about your having exercised the utmost good faith as well as your best skill and ability in the treatment of this case?"

To these questions plaintiff objected, "as leading and suggestive, calling for a conclusion and invading the province of the jury. It is the ultimate question for the jury, and not for the witness." These objections were sustained and the rulings are assigned as error. Similar questions were asked of Dr. Carr, the other member of the firm, in so far as his connection with the case was concerned, and he testified in reference thereto without objection. Appellant cites 9 Encyc. of Ev. 846, to the proposition that

8. PHYSICIANS AND SURGEONS: malpractice: negligence: exercise of skill, etc.: evidence.

a physician and surgeon sued for malpractice may be permitted to testify that, in his treatment of the plaintiff, he used the best ability and skill he possessed. The text cites *Doyle v. New York Eye & Ear Infirmary*, 80 N. Y. 631. In *Fisher v. Niccolls*, 2 Ill. App. 484 (S. C. Wade's Malpractice Cases, page 166), the court said:

"On the trial of the cause below, appellants were severally asked by their attorney if, in the treatment of appellee's hand, they exercised the best judgment and skill of which they were capable. The question was objected to by appellee and the objection sustained by the court. As there was no question made as to the general knowledge and skill of appellants, but the real controversy related to the manner in which they had treated appellee's hand, we think this evidence was proper and should have been admitted, as tending to rebut the charge of negligence."

See, also, *Bonnet v. Foote,* '(Colo.) 28 L. R. A. (N. S.) 136, 138.

Some of the cases say that the skill of a defendant, or the want of it, is put in issue in a suit for malpractice. But in the instant case, as in the Illinois case just referred to, we understand that the claim against defendants is

that they were negligent in the treatment of plaintiff's arm. While Dr. Brannon, who treated plaintiff, was the younger member of the firm, he had been practicing about seven years at the time of this transaction. Both defendants had been regularly admitted to practice. Appellee seeks to meet this point by the claim that the questions were leading and suggestive, and that it calls for a conclusion and invades the province of the jury. We think the questions are not leading or suggestive, nor do they call for the conclusion of the witness. As to the last suggestion, counsel for appellee say that, had defendant Brannon been allowed to give his opinion as to the degree of skill and knowledge he used in examining and treating plaintiff, he would have been deciding one of the questions which it was the jury's duty to decide. But this does not quite meet the objection. The witness was not asked as to whether he was negligent, or whether he exercised the care required of a physician in such cases. The purport of the questions is as to whether he, in good faith, used the skill and knowledge which he possessed. Appellee cites *Butler v. Chicago, B. & Q. R. Co.,* 87 Iowa 206, *Nosler v. Chicago, B. & Q. R. Co.,* 73 Iowa 268, to the point that, where the issue is as to whether a person exercised reasonable care and skill, and the facts are such that any man of common knowledge, experience or education is capable of forming a just conclusion, expert opinions are inadmissible, and that the question of negligence is for the jury alone. In the *Butler* case, the court refused to permit a witness to testify as to the skill of another person, the engineer, who was running the engine. The ruling was held correct. In the *Nosler* case, a railway engineer was asked as a witness whether he did everything he could to stop his train. This was held objectionable, and as the opinion of the witness, after he had stated all that he did. To the same effect, see *Bruggeman v. Illinois Cent. R. Co.,* 147 Iowa 187, 196.

But we think the rule is a little different with a professional man. He must not only possess the requisite degree of learning in his profession, but he must use it. It might be thought at first blush, and it is doubtless true, that, although defendants did use all the learning and skill they possessed, it would not be sufficient if they did not possess and use the knowledge and skill required of them by the law.

In 30 Cyc. 1570, after stating the degree of skill and care required, it is stated that it is the physician's duty to use reasonable care and diligence in the exercise of his skill and the application of his learning, and to act according to his best judgment. See, also, page 1575, same volume of Cyc., and 1578. In our opinion the court erred in excluding the offered testimony.

VIII. Other questions are argued, but

9. PHYSICIANS AND
SURGEONS: mal-
practice: negli-
gence: fail-
ure to utilize
means at hand:
evidence.

they are such as are not likely to occur on a new trial. The opinion is already too long, and we shall not take the time to discuss them in detail. But one other may be noticed briefly, and that is that we think there was no error in admitting evidence as to there being X-ray machines in the town where defendants were practicing, which were available to defendants. It is true that the petition did not charge the defendants with negligence in failing to use an X-ray machine, but it did charge as negligence that defendants failed to find out that the nerve was caught. There is testimony that a surgeon, to be certain whether or not the nerve is caught, should take an X-ray. That defendants did not use an X-ray machine was a circumstance to be considered by the jury as bearing upon the question as to whether defendants failed to use ordinary care to discover that the nerve was caught.

For the errors pointed out, the judgment is reversed

and the cause remanded for a new trial.—*Reversed and remanded.*

GAYNOR, C. J., WEAVER and STEVENS, JJ., concur.