The STATE of Iowa, Appellee,

v.

James Thomas GALLOWAY, Appellant.

No. 60719.

Supreme Court of Iowa.

Feb. 21, 1979.

Arthur L. Buzzell, Davenport, and Robert D. Bartels, Iowa City, for appellant.

Richard C. Turner, Atty. Gen., Thomas A. Evans, Jr., Asst. Atty. Gen., and Elizabeth O. Shaw, County Atty., for appellee.

HARRIS, Justice.

This is the third time we have considered an appeal from this defendant from a conviction for a brutal murder which occurred January 3, 1964, in Davenport. On defendant's first appeal we reversed and remanded for a new trial. *State v. Galloway,* 167 N.W.2d 89 (Iowa 1969). Retrial again resulted in a first-degree murder conviction. We affirmed on defendant's appeal. *State v. Galloway,* 187 N.W.2d 725 (Iowa 1971). Defendant thereafter petitioned in federal court for a writ of habeas corpus. On appeal in that proceeding defendant was awarded a new trial. *Galloway v. Brewer,* 525 F.2d 369 (8 Cir. 1975), cert. denied, 424 U.S. 974, 96 S.Ct. 1478, 47 L.Ed.2d 744 (1976). In this trial defendant was tried and convicted a third time and has brought this appeal. We find reversible error which clearly demands another reversal and a remand for a fourth trial.

On the evening of January 3, 1964, three men entered a store in Davenport. One remained at the front while the other two proceeded to the rear. The man who remained at the front pulled a revolver from his jacket and said there was to be a robbery. The two who had proceeded to the rear of the store confronted Mr. Shannon, the store owner, grabbed his right hand, and exchanged words with him. During this brief encounter a shot was fired and Mr. Shannon fell to the floor. He thereafter died from the wound he had suffered. Immediately after the shot was fired all three would-be robbers hurried from the scene without obtaining money.

In 1967, more than three years after the shooting, Helen Adomat and Richard Shannon selected a photograph of defendant, thereby identifying him as the person who fired the shot which killed Mr. Shannon. The photograph was selected from an array presented by law enforcement officers. There was conflicting testimony as to the manner in which the photographic "show-ups" were conducted. Both witnesses subsequently selected defendant in a lineup conducted in Kansas City, Missouri.

I. Defendant's first assignment challenges the trial court's instruction on the felony-murder rule. The challenged instruction informed the jury:

738

"Before the defendant, under this In-
struction, can be found guilty of the crime
of murder in the first degree as charged in
the Information, the State must establish
by the evidence beyond a reasonable doubt
each and all of the following propositions:

"[1] That on or about January 3, 1964, in
Scott County, Iowa, the defendant did un-
lawfully shoot Harry Shannon, Jr.

"[2] That Harry Shannon, Jr. died as a
result of being shot by the defendant.

"[3] That the defendant so shot Harry
Shannon, Jr. while attempting to perpetrate
the crime of robbery."

Defendant objected to paragraph 3 in the
above instruction and asked that it be
amended to inform the jury as follows:
"Paragraph 3. That the defendant so shot
Harry Shannon, Jr. *with malice afore-
thought* and while attempting to perpetrate
the crime of robbery." (Emphasis added.)

Without question the requested language
should have been added. Our felony-mur-
der rule is statutory. It is provided as a
part of § 690.2, The Code, 1977: "All *mur-
der* which is perpetrated by means of poi-
son, or lying in wait, or any other kind of
willful, deliberate, and premeditated killing,
*or which is committed in the perpetration
or attempt to perpetrate any arson, rape,
robbery, mayhem, or burglary,* is murder in
the first degree . . .." (Emphasis
added.)

Under the rule at common law the in-
struction given by the trial court would
have been correct. See 40 Am.Jur.2d,
Homicide, § 72, pp. 364–366; 40 C.J.S.
Homicide § 21, pp. 868–869. At common
law malice is imputed when a *killing* occurs
in the perpetration of the specified crime.

■ But the Iowa statute differs from
the common law and differs from the stat-
utes of many other states. As can be seen,
our felony-murder rule is not directed to
"killings" which occur in the perpetration of
the felony. Rather our rule is directed to
"murder" which may so occur. The effect
of the Iowa statute is to make *murders*
which occur in connection with the perpe-
tration of the named felonies *first-degree*

murder. This has been our rule for many
years. *State v. Campbell,* 217 Iowa 848,
853–854, 251 N.W. 717, 719 (1934).

Our more recent cases are in accord.
*State v. Veverka,* 271 N.W.2d 744, 747
(Iowa 1978); *State v. Rand,* 268 N.W.2d
642, 647 (Iowa 1979); *State v. Millspaugh,*
257 N.W.2d 513, 519 (Iowa 1977); *State v.
Nowlin,* 244 N.W.2d 596, 604 (Iowa 1976);
*State v. Conner,* 241 N.W.2d 447, 463 (Iowa
1976).

■ Under this rule it was error for
the trial court not to include the language
requested. Malice aforethought is a neces-
sary element for murder. § 690.1, The
Code. And murder must be committed in
order to implement our felony-murder rule.

Of course it does not aid the State that
the legislature changed our felony-murder
rule in the recent criminal code. § 707.2(2),
The Code, Supp., 1977.

II. Because it might recur on retrial, we
shall consider an evidentiary problem which
defendant assigns as error. Defendant be-
lieves the trial court erred in not admitting
the results of a scientific study as a part of
the basis for the witness' answer to a hypo-
thetical question.

Defendant offered the testimony of Dr.
Elizabeth Loftus. Dr. Loftus testified that
there was a "real possibility" of misidentifi-
cation of a murderer who is identified by
examination of photographs three years af-
ter the crime. In testifying Dr. Loftus
attempted to explain that her opinion was
based in part on an experiment performed
by an authority she identified as Professor
Buckhout. The State's objection to the ex-
planation was sustained.

The defendant made an offer of proof in
which Dr. Loftus explained Professor
Buckhout's experiment. An assault, staged
on a college campus, was witnessed by 141
persons who were unaware it would occur.
Those witnesses saw the staged assault for
approximately 42 seconds. Seven weeks la-
ter they were presented six photographs
and were asked to identify the assailant.
Only 40 percent of the witnesses could do
so. The offer of proof continued:

"Q. Was this study published somewhere? A. Descriptions of it have been published, yes.

"Q. And is that the kind of publication that psychologists rely on in forming an opinion generally conducting themselves as psychologists? A. We get our information in two ways; from personal conversations that we have with other scientists at either conventions or private meetings, or from the published literature.

"Q. Have you performed any experiments yourself that would be fairly supporting Dr. Buckhout's results? A. Yes, I have.

"Q. Well, do your—Do the results of those experiments support Dr. Buckhout's findings? A. They support the loss of memory performance after a longer retention versus a shorter one, and that says they do—they were not concerned with identification of perpetrators, and that's why I relied on Dr. Buckhout's study for my conclusion rather than on my own studies in that specific instance.

"Q. So the context of his study would have been more directly welded to this case than the context of your studies, is that—A. That's correct.

"Q. Do you know any psychologist who relies entirely on his own—his or her own experiments to form a basis of his or her expertise as a psychologist? A. Most of us rely on the field as a whole.

"MR. BARTELS: I have nothing further."

The offered explanation could have been received. In 2 Jones on Evidence, § 14:21 (1972) it is explained:

"From the standpoint of general qualifications it is obvious that experts become experts by relying on hearsay in the course of their training and experience, all of which is reflected in the so-called 'expertise' of the witness. But when it comes to the acquiring of factual knowledge of the specific subject as to which the witness is to testify the door has been generally closed to hearsay sources of information except to the extent that they come within some ex-ception to the hearsay rule and are admissible in evidence.

"In other words there is a distinction between hearsay as to specific facts relating to the case in question and general or specific information, even though of a hearsay character, which makes up the total package of the expert's information background and which is reflected in his opinion as expressed by one having special ability to evaluate sources of information and to measure their reliability according to standards of his profession or field of special training and experience."

See also McCormick on Evidence, chapter 3, § 15 (1972); *State v. Salter,* 162 N.W.2d 427, 430 (Iowa 1968); *Ver Steegh v. Flaugh,* 251 Iowa 1011, 1019, 103 N.W.2d 718, 723 (1960); II Wigmore on Evidence, § 686, pp. 812–813 (Third Ed. 1940); Weinstein's Evidence § 703(01) and § 703(03); Rules 703, 705 and 803(18), Federal Rules of Evidence.

A helpful explanation of the role of trial court discretion in admitting evidence of the pretrial studies and investigations of expert witnesses can be found in *Standard Oil Company of California v. Moore,* 251 F.2d 188, 222 (9 Cir. 1957). Under the foregoing authorities it is apparent that admissibility of such evidence rests within the sound discretion of the trial court. We cannot say that discretion was abused in this case.

Defendant's claim to the contrary is without merit.

III. Defendant presents three other assignments of error. We believe they relate to matters not likely to recur on retrial. To discuss each of them would unduly extend this opinion.

■ For the benefit of the bench and bar, however, we should point out that at least one other assignment would also have necessitated reversal. A new trial should have been ordered by reason of the failure of the prosecutor (predecessor in office to the county attorney named above) to disclose exculpatory evidence.

Before trial defendant moved for disclosure of all exculpatory evidence. In the motion defendant specifically sought any statements by Helen Adomat, who had identified defendant's picture. The motion was denied.

During trial defendant moved for disclosure of the names and addresses of any police officers who had interviewed or shown photographs to Helen Adomat. In submission of this motion the trial court inquired of the prosecutor whether police files contained a report that Helen Adomat (or other witnesses) "in the process of looking at pictures, at any time identified, tentatively or otherwise, a photograph or a person other than Paul Dunlap or James Thomas Galloway in connection with any part of this particular crime . . . ." The prosecutor denied existence of any such information. The trial court thereupon denied the motion.

After trial, material and police files not previously disclosed were, on motion, provided to defense counsel. Included in this material were reports showing that Helen Adomat had identified, with varying degrees of certainty, other individuals and stated they resembled the murderer. Between January and March of 1964 Mrs. Adomat had picked out one as "looking very similar to the man that shot Mr. Shannon." She picked out another as "strongly resembling the man that shot Mr. Shannon . . . ." The report indicated Mrs. Adomat believed "there was just something about this man that made her think he was the one that shot Mr. Shannon." As to another photograph she said he "closely resembled" the murderer.

Under the circumstances, whether or not the failure to produce was deliberate, a new trial should have been ordered. *State v. Peterson,* 219 N.W.2d 665, 674 (Iowa 1974).

REVERSED AND REMANDED.

All Justices concur, except REYNOLDSON, C. J., and LeGRAND, REES, UHLENHOPP, ALLBEE, McGIVERIN and LARSON, JJ., who concur specially.

REYNOLDSON, Chief Justice (concurring specially).

Because I do not agree with the holding in division II of majority's decision, I concur only in result.

The majority holds trial court has discretion to permit Professor Loftus to detail the incidents and results of a factually unrelated experiment conducted by another, and then base her opinion squarely on the other's conclusions ("[T]hat's why I relied on Dr. Buckhout's study for my conclusion rather than on my own studies in that specific instance."). The majority opens an unnecessary and expensive door in approving testimony of this type. Its holding allows admission of hearsay evidence which does not fall within any previously recognized exception. Finally, the majority effectively overrules prior decisions of this court without noting this for benefit of bench and bar.

I. The first question which ought to be addressed is whether any of Professor Loftus' opinion testimony should be admitted over the State's standing objection that the accuracy of eyewitness identification is not a proper subject of expert testimony. On this point there is a sharp contrast between the theoretical concepts of academicians concerned with development of the law and the pragmatic rulings of jurists responsible for litigation management.

Distilled to its essence, Professor Loftus' testimony was "the longer that period of time [between an incident and a witness' recollection of the incident] * * * the less accurate and less complete is a witness' recollection."

The commentators urge that experts like Professor Loftus should be permitted to testify in order to demonstrate the general unreliability of the memory of identification witnesses. See, e. g., N. Sobel, Eye-Witness Identification § 86.01 (1979 Supp.); Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification, 29 Stan.L. Rev. 969 (1977); Note, Expert Testimony on Eyewitness Perception, 82 Dick.L.Rev. 465 (1978).

However, research has produced not a single appellate decision in which such expert testimony was held admissible or its exclusion held to be an abuse of discretion. Cases to the contrary are legion. See *United States v. Smith,* 563 F.2d 1361, 1363 (9th Cir. 1977), cert. denied, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978); *United States v. Brown,* 540 F.2d 1048, 1053–54 (10th Cir. 1976), cert. denied, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977); *United States v. Brown,* 501 F.2d 146, 150–51 (9th Cir. 1974), rev'd on other grounds, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *United States v. Amaral,* 488 F.2d 1148, 1152–53 (9th Cir. 1973); *United States v. Fosher,* 449 F.Supp. 76 (D.Mass.1978); *United States v. Collins,* 395 F.Supp. 629, 635–37 (M.D.Pa.), aff'd mem., 523 F.2d 1051 (3d Cir. 1976); *State v. Valencia,* 118 Ariz. 136, 138, 575 P.2d 335, 337 (Ct.App.1977); *Criglow v. State,* 183 Ark. 407, 409–10, 36 S.W.2d 400, 401–02 (1931); *People v. Brooks,* 51 Cal.App.3d 602, 608–09, 124 Cal. Rptr. 492, 495 (1975), cert. denied, 424 U.S. 970, 96 S.Ct. 1469, 47 L.Ed.2d 738 (1976); *People v. Guzman,* 47 Cal.App.3d 380, 383–86, 121 Cal.Rptr. 69, 71–72 (1975); *People v. Johnson,* 38 Cal.App.3d 1, 6–7, 112 Cal.Rptr. 834, 836–37 (1974); *People v. Lawson,* 37 Colo.App. 442, 444–45, 551 P.2d 206, 208–09 (1976); *Dyas v. United States,* 376 A.2d 827, 831–32 (D.C.), cert. denied, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977); *Jones v. State,* 232 Ga. 762, 763–66, 208 S.E.2d 850, 852–54 (1974); *Pankey v. Commonwealth,* 485 S.W.2d 513, 522 (Ky.1972); *Commonwealth v. Jones,* 362 Mass. 497, 501–02, 287 N.E.2d 599, 602–03 (1972); *Commonwealth v. Middleton,* —— Mass.App. ——, 378 N.E.2d 450 (1978); *Porter v. State,* —— Nev., ——, 576 P.2d 275, 278–79 (1978); *People v. Suleski,* 58 A.D.2d 1023, 1024, 397 N.Y.S. 2d 280, 281–82 (1977); *People v. Valentine,* 53 A.D.2d 832, 832–33, 385 N.Y.S.2d 545, 546 (1976).

The predominant rationale for excluding such testimony which emerges from these cases is that the subject of the opinion offered is not beyond the knowledge and experience of a juror. See *Amaral,* 488 F.2d at 1152–53; *Fosher,* 449 F.Supp. at 77; *Criglow,* 183 Ark. at 409–10, 36 S.W.2d at

401; *Lawson,* 37 Colo.App. at 445, 551 P.2d at 209; *Dyas,* 376 A.2d at 832; *Middleton,* —— Mass.App. at ——, 378 N.E.2d at 450.

An unarticulated but underlying factor may be the constitutional protections relating to the use of out-of-court identifications. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The goal of the safeguards erected by the *Wade-Gilbert-Stovall* trilogy was exclusion of unreliable identification. The probative value of an identification which survives constitutional challenges should not be diminished by expert testimony that all eyewitness identifications are unreliable. Properly, I believe, the courts reason that further testing of reliability should be by vigorous and specific cross-examination of the eyewitness.

 Expert opinion testimony is admissible if it will aid the jury on some factual issue in the case. *Haumersen v. Ford Motor Co.,* 257 N.W.2d 7, 11 (Iowa 1977); *Ganrud v. Smith,* 206 N.W.2d 311, 314 (Iowa 1973); M. McCormick, Opinion Evidence in Iowa, 19 Drake L.Rev. 245, 257 (1970). I would hold trial court on retrial would be justified in sustaining an objection that Professor Loftus' opinion is not a proper subject of expert testimony.

In the final analysis, jurors daily experience the fragility of their own memories. They know recollection fades with time and is affected by the relative significance of the incident. Probably most have experienced on several occasions their own or another's misidentification in social or business relationships. Explanation of the scientifically identified mechanisms which bring about memory decay may be of academic interest, but it is of little aid to the jury in judging reliability of the particular eyewitness identification before them.

Pragmatically, much testimony in many types of litigation, criminal and civil, necessarily turns on witnesses' recall of past events. The cost and time which would be expended in collateral battles of experts

concerning the dynamics of the memory process probably weighs heavily in trial and appellate court decisions excluding such proof:

> How far should the courts go in allowing so-called scientific testimony, such as that of polygraph operators, hypnotists, "truth drug" administrants, as well as purveyors of general psychological theories, to substitute for the common sense of the jury? Surely the answer is "not in all cases, or even in the ordinary or usual cases." The good judgment of the trial judge as to whether the particular case contains such unusual factors as to make the "expert testimony" a help to jury determination or whether the case is one where the effect of such testimony threatens to take over the jury's function must control in the absence of a clear abuse of discretion.

*People v. Guzman,* 47 Cal.App.3d at 385–86, 121 Cal.Rptr. at 72.

This court and the public generally have been gravely concerned with the ever expanding expense and time involved in litigation. We should be slow to approve a rule which would inject another group of expensive forensic experts into an area historically reserved as the jury's domain.

II. The majority opinion further permits introduction of hearsay evidence by failing to distinguish two separate components of the foundation requirement for opinion testimony by experts: qualifications of the expert, and factual basis for the opinion.

■ As a preliminary matter, no one can dispute that Professor Loftus' relating the substance of other studies is hearsay. Her testimony contained assertions of fact offered for the truth of the matters asserted. See *State v. Jones,* 271 N.W.2d 761, 767 (Iowa 1978). In essence, Professor Loftus was bolstering her opinion by positing it on the studies, conclusions and opinions of others.

My dispute with the majority is over the use of factual basis cases to justify admission of this hearsay. The studies testified to may enhance the background and qualifications of the expert but they cannot provide a factual basis for the opinion.

■ The majority quotes from 2 Jones on Evidence § 14.21 (1972), which is a careful attempt to draw the distinction. See also J. Maguire, J. Weinstein, J. Chadbourn & J. Mansfield, Cases & Materials on Evidence 381–83 (6th ed. 1973); McCormick on Evidence, *supra,* at 36; 2 Wigmore on Evidence § 665b (3d ed. 1940). These words demonstrate that evidence of other studies upon which Professor Loftus relied affects the first foundation requirement, her qualifications. An expert unavoidably learns through hearsay in gaining the expertise required to qualify as an expert and relies on that hearsay in expressing an opinion. The use of such hearsay does not render the opinion inadmissible, but that does not mean the hearsay itself is admissible. Neither *Jones* nor the other cited treatises go that far.

The majority apparently attempts to provide an independent basis for admitting this hearsay by citing cases which relate only to the second foundation requirement, a factual basis.

■ The expert's opinion must be based on sufficient facts in the record. *Ganrud v. Smith,* 206 N.W.2d at 314; M. McCormick *supra,* at 256. The requirement of factual foundation enables the jury to properly evaluate the expert's testimony, since "the opinion is no stronger than the facts which support it." 2 Jones, *supra,* at 633.

■ Foundational facts must already appear in the record or be from the expert's firsthand knowledge or observations. *Albrecht v. Rausch,* 193 N.W.2d 492, 495 (Iowa 1972); 2 Jones, *supra* at 634; McCormick on Evidence, *supra* at 31. It follows inadmissible hearsay cannot provide an adequate factual foundation. *Ruby v. Easton,* 207 N.W.2d 10, 20 (Iowa 1973); *Wolf v. Murrane,* 199 N.W.2d 90, 96 (Iowa 1972); 2 Jones, *supra,* at 639–44. And because the foundation must be factual, an opinion may not have as its basis, to any extent, the opinion of another, even if such opinion is properly in the record. 2 Jones, *supra,* at 634; M. McCormick, *supra,* at 268; McCormick on Evidence, *supra,* at 32–33.

In the absence of statute or special circumstances, it has generally been held that the report of an independent third party as to a test or experiment made by him, or testimony as to the contents thereof, constituted inadmissible hearsay where the author of the report did not testify and was not subject to cross-examination.

Annot., 19 A.L.R.3d 1008, 1011 (1968).

This court has recognized an exception to this rule where the hearsay is contained in routine reports generated in the course of scientific tests directly relating to the controversy before the court. In *Ver Steegh v. Flaugh,* 251 Iowa 1011, 103 N.W.2d 718 (1960), results of veterinarian laboratory tests, made in the regular course of business, verified by a custodian and shown to be of a type regularly relied upon by veterinarians, were properly admitted. 251 Iowa at 1015–19, 103 N.W.2d at 720–23. In *State v. Salter,* 162 N.W.2d 427, 429–30 (Iowa 1968), a pathologist who supervised laboratory testing of a vaginal specimen was permitted to testify about the test results over hearsay and foundation objections. We affirmed. We went one step further in *State v. Davis,* 269 N.W.2d 434, 440–41 (Iowa 1978). The facts were similar to those in *Salter* except the *Davis* expert was the examining physician rather than a supervising pathologist. We held evidence of such test results, even though hearsay, was itself admissible as a basis for the expert's opinion.

The majority cites *Salter* and *Ver Steegh* without distinguishing between the type of hearsay involved in those cases and the hearsay defendant sought to introduce here. There is no Iowa precedent for extending the exception created in those cases to factually unrelated hearsay statements by persons having nothing to do with any facet of the case at bar.

Instead, older Iowa cases would not permit Professor Loftus to bolster her opinion by relating the substance of other studies. ■ Although § 622.23, The Code, provides that "[h]istorical works, books of science or art, and published maps or charts, when made by persons indifferent between the parties, are presumptive evidence of facts of general notoriety or interest therein stated," this court interprets this statute to permit only "facts of general notoriety of interest" to be shown by such sources, not esoteric research and opinions. See *Ingwersen v. Carr & Brannon,* 180 Iowa 988, 1000–03, 164 N.W. 217, 221–23 (1917).

■ An expert medical witness cannot be cross-examined with respect to specific opinions and conclusions contained in medical treatises unless he or she has first referred to such authority in support of the opinion. *Madsen v. Obermann,* 237 Iowa 461, 468, 22 N.W.2d 350, 355 (1946); *Wilcox v. Crumpton,* 219 Iowa 389, 394–95, 258 N.W. 704, 706–07 (1935). Nor may counsel read from a medical work and then ask his or her own expert witness if the expert agrees with the statement. *Morton v. Equitable Life Ins. Co.,* 218 Iowa 846, 857, 254 N.W. 325, 330 (1934). The expert witness must formulate the opinion upon his or her experience, knowledge or training and cannot simply relate the contents of a study, book or article. *Evans v. Iowa S. Util. Co.,* 205 Iowa 283, 290, 218 N.W. 66, 69 (1928).

In ruling an expert witness may inject into his or her testimony factually unrelated experiments, conclusions and opinions of others, as a basis for his or her expressed opinion, the majority effectively overrules these Iowa decisions.

■ I find nothing in the case before us which should persuade us to change the course of our decisions in this manner. I would hold trial court should again sustain proper objections to testimony concerning the substance of other studies.

LeGRAND, REES, UHLENHOPP, ALLBEE, McGIVERIN and LARSON, JJ., join in this special concurrence.