C. J. ELLER, Appellant, v. PAUL REVERE LIFE INSURANCE CO., Appellee.

No. 45111.

MAY 7, 1940.

REHEARING DENIED DECEMBER 13, 1940.

C. B. Hextell, for appellant.

Mills, Hewitt & Diltz, for appellee.

BLISS, J.—The plaintiff is an attorney past 60 years old who has practiced his profession in Des Moines for over half that time. In 1934, the defendant issued to him the policy sued upon, insuring him against loss from bodily injuries effected directly and independently of all other causes by accidental means. The indemnity provided for was $100 a month, with an additional amount in the event of hospitalization. The defendant paid indemnity of approximately $1,400, up to March 21, 1938, and refused to make further payments. Plaintiff's substituted petition alleged that on the morning of January 21, 1937, he accidently slipped and fell upon an icy sidewalk, and thereby sustained the following injuries: The breaking of his right 9th and 10th ribs, bruises about head, torn and sprained ligaments in the neck, injured articulating facets and processes and lamina bones between the vertebrae of his neck, and a fracture of right facet and processes of lamina bone between third and fourth vertebrae so as to cause pressure on the spinal cord nerves passing out through said vertebrae, and a fracture of the 6th cervical and upper dorsal vertebrae, an injury to the occipital bone, a cerebral insult and a concussion. The petition further alleged: That, due to said injuries, the plaintiff, since the date of said accident, had been continuously and totally disabled from engaging in any gainful occupation and had required the regular and personal attendance of licensed physicians, and that he would be thus totally disabled for an

unknown and indefinite period; that he had been confined in a Kansas City hospital, in 1938, from April 5th to the 25th, May 11th to the 17th, and July 1st and 2d; that there was due him, under his policy, $200 for March 21st to April 21st, $200 for April 21st to May 21st, $100 for May 21st to June 21st, $200 for June 21st to July 21st, and $100 for July 21st to August 21st, all in 1938. The defendant filed an answer in three divisions. In each there was a general denial, an admission of the issuance of the policy, and the payment of total disability payments up to March 21, 1938. In division I, defendant denied the alleged disability between March 21 and August 21, 1938. In division II, it denied such disability between July 21st and August 21st, and in division III, it denied such disability between August 1st and August 21st. Plaintiff filed a motion to require the defendant to elect on which division it would stand, and as alternative relief, that the last two divisions be stricken. The relief was denied and we find no error in the rulings.

The trial began on the morning of March 9, 1939, and closed in the afternoon of March 15th, following. The plaintiff was on the witness stand over a day, and in addition to testifying, actively participated in the trial, by advising his attorney respecting questions to be asked and objections to be made, by citing law to and arguing with the court, and by controversy with opposing counsel. By words and action he sought to convey to the jury that he was still suffering grievously as a result of his accident. He put one of his attending doctors on the witness stand, and read the deposition of his attending doctor in the Kansas City hospital. Their testimony supported, in general, the claims of plaintiff. From the testimony of the plaintiff and others, it appeared that plaintiff had been to the Mayo Clinic at Rochester, to Dr. Steindler at Iowa City, and to several other doctors, but no testimony was introduced from these sources, except as it was indirectly given by the plaintiff. The defendant used eleven doctors as witnesses. Dr. Price and Dr. Harnagel, at the request of the Preferred Accident Insurance Company, which was resisting an indemnity claim based on this accident, examined the plaintiff, at his home, on June 24,

1937. Without going into detail, we may fairly say that their testimony, based upon their examination of plaintiff, and of X-rays of his person, disclosed nothing of a disabling nature as a result of the accident. Dr. Leir, a specialist in the taking and reading X-rays, on March 7, 1937, less than six weeks after the accident, took X-ray pictures of the alleged injured parts of plaintiff, and testified that they showed the parts to be normal, without any displacement or misalignment of the spine or any of the vertebrae thereof, or any evidence of there ever having been any fractures or crushing of any of the vertebrae or the facets thereof. He also examined the X-ray pictures taken at the Kansas City hospital, about March or April 1938, and testified that while the light was not plain enough to show any fractures, the position and alignment of the cervical spine and vertebrae seemed normal. Dr. Burcham, another such specialist, took X-rays of the plaintiff on March 24 and 26, 1938. His testimony corroborated Dr. Leir's. He found no displacement, misalignment or fractures of any of the vertebrae, and testified that if there had been any fractures, the pictures would have disclosed them. He also examined the Kansas City X-rays, and testified that they showed no evidence of displacement, misalignment or fractures of the cervical or dorsal vertebrae, complained of, or of any of their facets. Dr. Henry, a specialist in nervous and mental diseases, Dr. Wirtz, an orthopedic surgeon, or bone specialist, Dr. Royal, a general physician, all appointed by the court, on application of the defendant, to make the examination, with the aid of an X-ray technician, examined the plaintiff, on February 5, 1939. He gave them an oral and written history of his case. Dr. Henry testified that the X-ray plates taken showed no abnormalities, no fractures, lack of alignment nor slipping of the vertebrae, nor evidence of prior injury. One picture showed a little arthritis, but there was no suggestion that it was traumatic. He testified that the actions and complaints of the plaintiff were of such a nature as to indicate that he had developed a psycho-neurotic mental state with reference to his injury so that it dominated his mental attitude or outlook after the physical effect of the

injury had passed. He also testified that he had developed a mental attitude known as the ''security of disability'', that is a sense of security based upon what his disability promises or produces for him, in the way of medical attention or financial remuneration, making him feel incompetent to go back to work, and giving him a feeling that the safer thing for him is to hold on to these things. In other words that the disability he has has become his feeling of security.

Dr. Wirtz gave like testimony respecting what the X-ray pictures disclosed. He further testified:

''I could not find any objective symptoms of any injury—all symptoms were his history and subjective. I examined his neck. I found no lumps. The physical contour of his neck was normal—no spasticity of the neck muscles. I could not find any restriction of motion of his neck. It was free up and down and sidewise. I couldn't find any evidence of nerve injury, and no muscle spasms. He was well nourished, chest developed. Examination showed nothing abnormal. I find nothing wrong with the facets nor alignment or side slipping of the vertebrae. I made the statement after examining this man that I had arrived at the conclusion he had developed a mental condition that caused him to feel that he had an incurable condition or injury, or at least one that no one could diagnose or cure. As a result of this mental attitude, I felt he seemed to picture his symptoms worse than they really were.''

Dr. Royal was unable to testify. Dr. Ely, a specialist on mental and nervous diseases, basing his answers solely on hypotheses, testified:

''I would be justified in assuming that the man had a traumatic hysteria. It is a condition, a state of mind in which an individual as the result of something which precipitates or forms an occasion or nucleus for its origin, begins to believe he has certain physical defects or injuries or diseases, processes going on in his body, and that as the result of his subconscious belief, he develops symptoms referable to certain portions of his

body, the insecurity of which loom large in his mind. It is a condition of mind, and the mind dominates over the body, which produces the condition we call hysteria. I think the symptoms assumed are ascribable to a psycho-neurosis or a traumatic hysteria, with reasonable allowance for the repair of soft tissues, which in my opinion would be a period of about one year, as a maximum, from the date of injury."

According to the plaintiff's testimony, he was unconscious at the time of his fall for 15 or 20 minutes. Dr. Ely testified that there was a relation between the period of daze and the severity of the original injury—the longer the period of unconsciousness, the more severe the injury—and that assuming the person to have been dazed or semiconscious for the time stated, it would indicate any injury to the brain was not serious. The doctor also examined the X-ray plates taken at Kansas City and testified that there was nothing indicating a displacement or injury to the area inquired about.

Dr. Wolcott, an orthopedic specialist, in answer to a hypothetical question, testified that any injuries such as broken facets, fractures and dislocations would heal in from six months to a year, and the soft tissues would usually repair in three months; that ordinary brain concussion ought not to interfere with the power of concentration for any great length of time. Dr. Sones, a general physician and surgeon, in answer to a hypothetical question, testified that the assumed injuries would not disable the injured person from practicing law after 14 months from the injury.

In our judgment there was substantial evidence in the record to support the verdict of the jury.

I. Appellant's first assignment of error is that the attorney for the appellee interrogated the plaintiff relative to claims that he was making for indemnity for his injury against two other insurance companies, which indemnities, including the claim at bar, would average $500 a month, and that such recoveries would be more profitable to him than practicing law. Objections to all of these questions were sustained. Although

the appellant requested an admonition to the jury in one of his objections which was not given, the court instructed the jury to consider only such evidence as was admitted. Furthermore the fact of the existence of these other claims or suits was brought out in other ways and made known to the jury. We think there·was no prejudicial error in this interrogation. Appellant also complains that these same matters were referred to in appellee's argument. Appellant's attorney, however, in his opening argument rather took the lead in this matter. He said:

"Yes, the doctors here, a couple of them, told you about the security that there was in this insurance for Mr. Eller, just thought unconsciously in his mind that there was something wrong simply because of the security that he might have. Now that is the thing they tried to convey to you. * * * What is this security?"

For answer, appellee's attorney, after stating that appellant's Kansas City doctor had urged appellant to gradually resume his normal activities, as the best course to follow, replied thus:

"If he is to believe him, Doctor· Dickson, and believe in the efficacy of his treatment, which he pretends to as he talks to you from the witness stand, why in the world is he so reluctant to follow his advice and resume his normal activities? And I have the answer to that, I got it from Doctor Henry and from Doctor Ely and from Doctor Wolcott, and I don't know how many more on there. Doctor Henry called it the security of disability. Mr. Myers said, what in the world did he mean by security of disability. I can answer that very perfectly. The security of disability in this case is five or six hundred dollars per month insurance. That is the answer to Mr. Myers' question, he asked it and I will give it to him. That is the security of disability, and I say that in these days, from my experience in the law practice, it is rather an attractive security."

The record supported everything stated by the appel-

lee's attorney excepting the monthly figures, and his remark about the law practice. No objection or exception was made by appellant to these remarks, at the time they were made. Objection was first made in the motion for new trial. Appellant attempts to excuse the failure to make timely objection by a so-called agreement of the attorneys. It appears that appellee's attorney made objection to a statement made in appellant's opening argument, as not having support in the record. Appellant's attorney reaffirmed his statement. Whereupon this colloquy took place:

"Mr. Diltz: Just a minute, can we avoid on behalf of both parties, both of us, repetition of any objections, and agree that without making a specific objection to any portion of your argument, and of course you have the same privilege, at the time that the remarks are made, that a general objection may stand to any and all portions of the argument.

"Mr. Myers: That is all right, you may make any objections you want. I will be happy to do that so I will not be interrupted here in my argument."

The statement is far from clear, and it is not surprising that the minds of Mr. Diltz and Mr. Myers had difficulty in meeting. At least once thereafter Mr. Diltz made objection to Mr. Myers' remarks. During his own argument, Mr. Diltz, several times stated that if he was misstating the record, Mr. Myers would and should stop him. This colloquy later took place:

"Now, if I was wrong, Mr. Myers would stop me. If I call your attention to some portions of this record and you say that is wrong, I don't remember. Here is the way it can always be tested out, if I get to misquoting this record on any material point, anything that is of any importance, Mr. Myers' duty is to stop me.

"Mr. Myers: No, I will not answer until it is my time, I will meet those then, I told you that.

"Mr. Diltz: Then maybe he is not as good a lawyer as

1256

I thought he was because he is not justified on behalf of his client to let me stand up and quote facts, evidence to you, and when I point it out to you, if it is not true, if it is not there in the record.''

Counsel for appellant in his written argument states that it must be assumed that the agreement was made in the presence of the court and was approved by the court, since there is no showing of his absence. Beans v. Denny, 141 Iowa 52, 65, 117 N. W. 1091. Counsel is apparently in error, since the following appears in the transcript:

''The court. Can it be agreed that I may be outside of hearing during the arguments, unless I am needed? Mr. Myers: Yes, Your Honor. Mr. Diltz: Yes, sir.''

Counsel for appellee urges upon us that what he meant was that after objection was once made it need not be repeated to like objectionable remarks. Appellant urges that it was a waiver of all objection during the arguments. Such a side agreement of attorneys would be very unfair to the trial court, and an unwarranted and improper interference with orderly trial procedure, and contrary to the best interests of the public and of the litigants. Objections should be made at such times as will permit the court to most effectively remedy any harm done. We find no reversible error in the matter complained of.

II. The appellee submitted to Dr. Wolcott a hypothetical question terminating thus:

'' * * * are you able under this assumption of facts to give a professional opinion as to whether or not the fall and the injury to the head and neck described in the assumed facts would or would not cause the patient to be so disabled as to engage in the practice of his profession at all times during the period from March 21, 1938, to August 21, 1938?''

Objection was made that the question assumed only a portion of the facts shown, and included matters foreign to the record, was incompetent, irrelevant and immaterial, called

for a conclusion and opinion of the witness and invaded the province of the jury. The objection having been overruled, Dr. Wolcott answered:

"Assuming all things that have been mentioned in the hypothetical question to be facts, I could not explain a continued disability beyond approximately March 21, 1938, on the basis of those facts mentioned in the statements."

The same question was put to both Dr. Ely and Dr. Sones, with the same objection and ruling. Dr. Ely answered:

"My opinion would be that this period in 1938, that he was not incapable of performing his duties as a lawyer because of any purely physical disability caused by the fall."

Dr. Sones answered:

"My opinion is that it would not disable him from practicing."

The appellant contends that these questions and answers invade the province of the jury in that the questions call for an answer to the very question which the jury must answer, and for the ultimate fact which the jury must find. The decisions of this court have not been entirely in accord on this question, and on others kindred thereto. However we do not feel called upon to decide, and we do not decide, the abstract propriety of the question and answers objected to, for the reason that the appellant, in the earlier presentation of his case, had procured the introduction, over objection, of the same kind of testimony. The appellant had asked Dr. Griffin whether the injuries suffered by the appellant had disabled him from performing his work as a lawyer, during the period in question. Proper objection was made and sustained upon the ground that the witness had not seen enough of the appellant during the time in question to qualify him to answer. After some further questioning the witness showed considerable association with appellant during that time. Over proper objection, the following questions and answers were permitted:

"Q. Now, Doctor, during the time commencing February 1, 1937, as I understand it, when you first saw Mr. Eller, up to August 21, 1938, did you observe his condition? A. Yes, sir.

"Q. During any of that time, in your opinion, was he able to do any work? A. You mean his legal work?

"Q. Yes. A. No, sir, in my opinion.

"Q. What, in your opinion would have been the reaction, the result, during this period of time, i. e., from the first time you saw Mr. Eller to August 21, 1938, if he attempted to do any work, any mental strain or any physical work? A. Well, he would get extremely nervous, could not sleep, irritable, and he would just give out."

The appellant by introducing expert opinion testimony showing his disability to work as a lawyer, during the period in question, has no basis for complaint, when the appellee seeks to show, by other expert opinion testimony, that such disability, if any, was not due to his accidental fall. Having opened the door to admit his testimony, he cannot be permitted to close it to the entrance of like testimony offered by appellee. Such was the holding of the court in Ingwersen v. Carr & Brannon, 180 Iowa 988, 1003, 1004, 164 N. W. 217.

III. On January 24, 1939, upon the application of appellee, the court made an order directing the appellant to permit Doctors Royal, Henry, and Wirtz, with an X-ray technician, to examine him respecting his injuries and their connection with any disability suffered by him during the five months in question. They examined appellant, with his full co-operation, and gave him and the court their written report thereof. Their testimony has been set out herein. Appellant filed an answer resisting the application for the order. He assigns error upon the grounds, first, that the court had no jurisdiction of the appellant or the subject matter; second and third, that the order permitted examination respecting appellant's condition both prior and subsequent to the five months for which indemnity was claimed; fourth, that it was error to

admit the order in evidence, as it gave the appellee opportunity to comment on the disinterestedness of the court's appointed doctors.

Without commenting specifically upon each ground, we have no hesitancy in saying that we find no merit in any of them. Under paragraph 8 of the policy, it was provided:

"The company shall have the right and opportunity through its Medical Representative to examine the person of the insured while living when and so often as it may reasonably require during the pendency of claim hereunder."

In the case of Eller v. Guthrie, 226 Iowa 467, 284 N. W. 412, we construed this identical clause in another policy of the appellant, and held that the insurer was entitled to the full enforcement of this provision. The appellee was entitled to such an examination as the court ordered, without any such order. The appellant, by his pleadings and proof, went into matters pertaining to his physical condition from the date of his fall to the time of his trial. This was proper as bearing on his condition from March 21st to August 21st. It was likewise proper for the doctors to cover the same period for the same purpose. Counsel is in error in stating that the entire order of the court was admitted in evidence. Just two lines thereof, showing that the examination was at the expense of the defendant were read into the record. We find no merit in this assignment of error.

■ IV. Appellant assigns error because the court sustained appellee's motion to strike from appellant's reply, the allegations that the appellee by admitting payment of indemnity up to March 21, 1938, was estopped to make any claim that appellant was not totally and continuously disabled up to that time. There was no error in the court's ruling. The appellee never at any time admitted that appellant was ever totally disabled at any time, and the fact that it paid indemnity was not an express or inferential admission of such disability. There was no element of estoppel in such payment.

■ V. Appellant complains because the court instructed

the jury that any indemnity, which it might allow for hospitalization, should not exceed $66.67. This figure was correct, but if it were not, there was no error, since the jury found there was no liability whatsoever on the part of the appellee.

VI. Appellant assigns error because of instruction No. 3. We can see no merit in his complaint. It clearly and fully stated the burden of proof which the appellant had to sustain to recover.

VII. Instruction No. 11 properly told the jury that it must determine for what period, if any, between March 21st and August 21st, the appellant was disabled as alleged, and to compute the indemnity for the period so found, but in no event to go beyond August 21, 1938. We find no error in the instruction.

VIII. Appellant's last assignment of error is based upon the overruling of his motion for new trial. We have carefully considered the matters complained of but find no error therein.

Appellant filed a motion to strike appellee's additional brief, filed March 4, 1940, and which contained some additional authorities. The filing of the same has in no material way aided the appellee, and striking it would in no way aid the appellant. Had the appellant cared to file anything further in reply, we believe he would have asked for that privilege, as he no doubt is familiar with court's liberality in granting such a privilege in such cases.

Appellant also moved to strike appellee's amendment to the abstract and in the event of an adverse ruling thereon, asked to certify the transcript. Some matters in the amendment are conclusions rather than statements of the record. Other matters, however, are proper, and we have found no material variance from the transcript. Both motions to strike are overruled.

It is our judgment that the issues have been fairly tried, and the judgment appealed from is therefore affirmed.—Affirmed.

CHIEF JUSTICE and all JUSTICES concur.