**Allen E. FRYER, Appellant,**

**v.**

**Crispus NIX, Warden of the Iowa State Penitentiary, Appellees.**

**No. 84–1785.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 28, 1985.

Decided Oct. 21, 1985.

Rehearing and Rehearing En Banc Denied Nov. 26, 1985.

Michael D. Green & John Burns, Iowa City, Iowa, for appellant.

Brent R. Appell, Des Moines, Iowa, for appellees.

Before LAY, Chief Judge, FAGG and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

On the evening of November 17, 1973 a group of five teenagers went to Gitchie Manitou State Park in Lyon County, Iowa. During that evening in the park, four of the teenagers—Roger Essem, Michael Hadrath, Stewart Baade, and Dana Baade—were shot to death. On August 13, 1974 Allen Fryer was convicted of four counts of first degree murder, largely on the testimony of the fifth teenager and sole survivor, Sandra Cheskey. On May 11, 1983, Fryer, having exhausted his remedies in the state courts as required by 28 U.S.C. § 2254(b),[1] filed a petition for a writ of habeas corpus in the Southern District of Iowa. The District Court[2] denied Fryer's petition. Fryer now appeals the denial of his petition for habeas corpus. We affirm the denial of Fryer's petition.

## I.

■ Fryer's first claim is that the District Court erred in holding that sufficient evidence was introduced at trial to convict him of four counts of first-degree murder. A habeas corpus petitioner is entitled to relief on the ground of insufficient evidence only if, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The record reveals that on the evening of November 17, 1973 Allen Fryer and his brothers David and James Fryer were in Gitchie Manitou State Park, when they saw the five teenagers gathered around a campfire. The Fryers believed that the teenagers had marijuana, and, after brief discussion, decided to go back to their truck for their shotguns so that they could take the marijuana.

After getting their shotguns, Allen and David Fryer returned to where they had seen the teenagers, positioned themselves on a ledge overlooking the campfire, and opened fire. Two of the teenagers fell—Roger Essem with a fatal wound and Stewart Baade with a non-fatal wound. The Fryers then yelled at the remaining teenagers, who had taken cover, to come out from behind the trees. Michael Hadrath emerged from the trees with Sandra Cheskey, and asked their assailants who they were. Allen Fryer shot Hadrath, wounding him in the arm, and then told him that they were police officers.

Sandra Cheskey, though not wounded, fell to the ground with Hadrath. Allen Fryer walked over to her, kicked her, and said that he thought she was playing dead. He then ordered Cheskey, Hadrath, and Dana Baade to walk along a trail that led away from the campfire. After a short time, Allen Fryer stopped them, briefly conferred with his brother David, and left the teenagers with him. When he returned, Allen Fryer again ordered the three teenagers to proceed along the trail, and shortly thereafter again ordered them to stop. He again left the teenagers with David Fryer for a short time. After returning and herding the teenagers yet further along the trail, Allen Fryer stopped them and shouted "over here," at which point a truck driven by James Fryer pulled up.

1. After being convicted at trial, Fryer filed a direct appeal to the Iowa Supreme Court, which was dismissed. Fryer thereafter filed an application for post-conviction relief that was dismissed by the post-conviction court on procedural grounds, but was reinstated by the Iowa Supreme Court in *Fryer v. Hamilton,* 278 N.W.2d 5 (Iowa 1979). Fryer's application for post-conviction relief then was denied on the merits by the post-conviction court, which decision was affirmed by the Iowa Supreme Court in *Fryer v. State,* 325 N.W.2d 400 (Iowa 1982).

2. The Honorable William C. Stuart, United States District Judge for the Southern District of Iowa.

Allen Fryer conferred briefly with James Fryer, then tied Sandra Cheskey's hands behind her back and put her in the truck. He later untied her hands and left again. When he returned, he started the truck and drove off with Sandra Cheskey. As they were leaving, Sandra Cheskey saw Michael Hadrath, Dana Baade, and Stewart Baade (who had in the meantime apparently also been brought to the truck by the Fryers), alive for the last time, with James and David Fryer.

Allen Fryer drove Sandra Cheskey around for a short time. He continued to pretend to be a police officer and told Cheskey that he was trying to keep her out of trouble. He told her that he was the boss and that anything he said, his two brothers would do. He then met David and James on the road and talked to them briefly. James got into the truck and they went to an abandoned farm where James Fryer raped Cheskey. Allen Fryer then took Cheskey home.

At Fryer's trial, the trial court instructed the jury that it could find Allen Fryer guilty of first-degree murder, with respect to each count charged, if it found that Fryer inflicted the wound that caused death with malice aforethought, deliberation, premeditation, and a specific intent to kill, or aided and abetted in the same,[3] or if it found that Fryer killed any of the teenagers during the commission of or during the attempt to commit a robbery, or aided and abetted in the same.

In the present case, viewing the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the prosecution, we conclude that a jury reasonably could have reached the conclusion that Allen Fryer aided and abetted the deliberate and premeditated executions of the four teenagers.[4] Accordingly, we reject Fryer's claim regarding the sufficiency of the evidence.

## II.

Fryer's second claim is that he is entitled to a new trial under the standards laid out in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because the prosecution suppressed material evidence favorable to him. The particular evidence in question is a statement given by Sandra Cheskey to the police on the evening of November 29, 1973 shortly after she had observed Allen Fryer and recognized him as her assailant. The statement, in relevant part, reads: "The man who I identified tonight in the pickup, was the one they called the 'Boss.' He was the one who shot Mike and Stu that night. He is the one that took me from the park...." Appendix at 89.

Consistent with the standard laid out in *Brady,* a prosecutor must disclose to defense counsel "evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial...." *United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). A defendant is deprived of a fair trial "only if the evidence is material in the sense that

---

**3.** Under Iowa law, a defendant may be convicted of a crime, as if he were a principal, on an aiding and abetting theory if the defendant knowingly assents "to an act or ... lend[s] countenance or approval either by active participation in it or by some manner encouraging it." *State v. Daves,* 259 Iowa 584, 144 N.W.2d 879, 881 (1966).

**4.** The state's theory at trial was that Allen Fryer aided and abetted the murders of Hadrath and the two Baades, but that Fryer actually shot and killed Roger Essem. As we have already noted, Sandra Cheskey testified that Allen and David Fryer appeared on a ledge and each appeared to fire a shot. One shot killed Roger Essem, the other shot wounded Stewart Baade. Cheskey also testified that she believed that it was Allen Fryer's shot that caused Essem to fall. Fryer's counsel presented ballistics evidence to dispute Cheskey's testimony. Because the jury was instructed that it could find Allen Fryer guilty of the first-degree murder of Roger Essem whether Fryer actually shot Essem or merely aided and abetted in his death, we need not determine whether Fryer shot Stewart Baade or Roger Essem. Under Iowa law, Fryer is equally guilty of Essem's death in either case, and the State presented sufficient evidence from which the jury reasonably could have concluded that Fryer aided and abetted in Essem's murder.

its suppression undermines confidence in the outcome of the trial." *Id.* at 3381.

Fryer contends that Cheskey's statement, used properly at trial, would have impeached Cheskey's testimony that Fryer shot Roger Essem, because the statement indicates only that Fryer shot Hadrath and Stewart Baade, and does not indicate that Fryer shot Essem. We are not convinced that Cheskey's statement is material within the meaning of *Brady* merely because it does not contain the inculpatory language Fryer thought it might. *See United States v. Ben M. Hogan Company,* 769 F.2d 1293, 1299 n. 8 (8th Cir.1985). But even if we accept Fryer's contention that Cheskey's statement to the police would ·have impeached in any way her testimony that Fryer actually fired the shot that killed Roger Essem, Cheskey's statement casts no doubt whatsoever on evidence that Fryer aided and abetted the murder of Essem, and thus in no way materially affects a determination that Fryer is guilty of the first-degree murder of Essem.

■ This case bears some resemblance to *Brady v. Maryland.* In *Brady,* the defendant and a companion had been convicted of first-degree murder, and sentenced to death. The prosecution had withheld a statement made by the companion that he had done the actual killing. The Maryland Court of Appeals concluded that even "[i]f [the companion's] withheld confession had been before the jury, nothing in it would have reduced the appellant Brady's offense below murder in the first degree. We, therefore, see no occasion to retry that issue." *Brady v. State,* 226 Md. 422, 174 A.2d 167, 171 (Md.1961), *quoted in Brady v. Maryland,* 373 U.S. at 88, 83 S.Ct. at 1197 (emphasis deleted). The Su-

preme Court affirmed this holding by the Maryland Court of Appeals. Similarly, in the instant case, nothing in Cheskey's statement would reduce Fryer's offense below murder in the first degree. Thus, we reject Fryer's claim that under *Brady* he is entitled to a new trial.[5]

### III.

Fryer's third contention on appeal is that the District Court erred in determining that his November 30, 1973 statement was voluntary. Fryer contends that a number of factors indicate that his will was overborne.

Fryer was arrested in the late afternoon or early evening of November 29, 1973 after Sandra Cheskey had identified him in Sioux Falls, South Dakota. He was read his rights and taken to the Sioux Falls Police Station. Upon arrival at the station at about 7:00 p.m., Fryer was given a form with his rights written on it. His rights also were explained to him. Fryer said he understood his rights. Fryer signed an acknowledgment and waiver of his rights, and was interrogated for three-and-one-half hours, with coffee breaks every 30–45 minutes, by two police officers. Fryer was permitted to smoke and go to the restroom. During this first interrogation, Fryer denied all knowledge of the Gitchie Manitou killings.

At 10:30 p.m., Fryer was again advised of his rights; he again acknowledged that he understood his rights and signed a form indicating that he wished to waive them. In addition to the signed waiver, Fryer had the following colloquy with one of the police officers:

> This aspect of the *Brady* decision is totally inapposite to Fryer's case. Having been convicted of four counts of first-degree murder, Fryer was sentenced by the trial court to imprisonment for life on each count, with the four life sentences to run concurrently. Under Iowa law, no lesser sentence is available. *See* Iowa Code Ann. §§ 707.2, 902.1.

---

**5.** The Supreme Court did hold in *Brady,* affirming the holding of the Maryland Court of Appeals, that Brady was entitled to a new trial on the issue of punishment. The Court believed that while the companion's confession was not material to a determination of guilt or innocence, the confession was material to the issue of punishment since the fact that Brady had not actually killed the victim could have persuaded the jury to sentence Brady to life imprisonment instead of death.

Q Have you been advised of your right to remain silent?

A Yes.

Q The fact that you don't have to say anything if you don't want to?

A Yes.

Q Have you been advised that anything you say can and will be used against you in a court of law?

A Yes.

Q Have you been advised that you have a right to consult with a lawyer?

A Yes.

Q Before you answer any questions?

A Yes.

Q Or before you make any statements?

A Yes.

Q And you understand that you can have a lawyer present during this questioning?

A Yes.

Q Do you understand that if you can't afford a lawyer that one could be appointed for you?

A Yes.

Q Do you realize that you have a right to have a lawyer present during this questioning if you want one present?

A Yes.

Q Do you realize that if you answer questions or make any statements without consulting a lawyer or without having a lawyer present during this questioning you will still have the right to stop answering the questions or make any statements until you consult with a lawyer?

A Yes.

Q You have answered yes to all of these questions that I have asked you. Do you understand these questions that I have asked you?

A Yes.

Q Do you at this time want to give us a statement about what happened?

A I want to tell you the whole works.

Appendix at 96–97. Fryer then made a statement in which he apparently admitted being present during the shooting, but denied firing any shots himself.

Shortly after making this statement, Fryer agreed to retrace with three police officers the route he had traveled on the night of the murders. Following the ride, the officers and Fryer returned to the station, where coffee, donuts, and rolls were served. Fryer ate a donut.

Upon returning to the station, the officers learned that David Fryer, who was also in custody, had made a statement to the police that contradicted the statement Allen Fryer had given. A police officer confronted Allen Fryer with the contradictions and told Fryer what he thought had happened the night of the murders. Fryer told the officer that the officer was right. Fryer was again read his rights and again acknowledged understanding them. He then gave another statement. At about 5:30 a.m., Fryer went to sleep.

Sometime after noon the next day, Fryer's statement was transcribed and taken to him. Fryer spent approximately 30 minutes reviewing the statement, and pointed out two changes that he felt needed to be made. After a police officer made the changes, Fryer initialed the changes and signed the statement.

Fryer contends that the District Court erred in concluding that his statement to the police was voluntary, because an examination of the totality of circumstances indicates that his will was overborne by the police interrogations. In support of this contention, Fryer points to his lower-than-average I.Q., and to the fact that he was not taken promptly before a magistrate, but rather was interrogated for eight-and-one-half hours prior to the time he began to make the statement here challenged. Each of these factors is indeed important to a determination of whether a challenged confession is voluntary. Yet after examining the totality of the circumstances, we cannot conclude that Fryer's confession was involuntary.

Fryer was 29 years old at the time of his conviction. He was married and employed

on a farm, where he cared for machinery and for livestock. He had gone to school until he was sixteen years old, at which point he was in the seventh grade. We note that the post-conviction hearing in Iowa District Court demonstrated Fryer's ability to understand spoken English and to read and comprehend documents. That court found Fryer's full scale I.Q. to be 87.

■ An eight-and-one-half hour interrogation, though punctuated by numerous breaks, is a long period of time for a suspect to be questioned. However, Fryer's right to counsel and his right to refuse to answer questions were explained to him in clear and understandable terms several times as the evening progressed. Moreover, the police had good reason to disbelieve Fryer's initial statements, and Fryer never indicated that he wished to stop the interrogation; rather, each time his rights were explained to him he indicated his willingness to talk. "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver...." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). The record shows and we conclude that Fryer's waiver of rights was intelligently and voluntarily made. *See id.* at 374 n. 4, 99 S.Ct. at 1757 n. 4. We find nothing in the record that would lead to the conclusion that Fryer's decision to make a statement was not a choice freely made.[6] Thus, we reject Fryer's contention that his statement was involuntary.

### IV.

Fryer next contends that the District Court erred in finding that the procedure used by the trial court in determining that his statement was voluntary was constitutionally adequate. Specifically, Fryer complains first about the failure of the trial court to conduct his voluntariness hearing outside the presence of the jury, and complains second about the "truncated" nature of his voluntariness hearing.

A hearing on the voluntariness of a defendant's confession must "be fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend." *Jackson v. Denno,* 378 U.S. 368, 391, 84 S.Ct. 1774, 1788, 12 L.Ed.2d 908 (1964) (footnote omitted). The fact that the hearing was conducted in the presence of the jury is, of course, a factor to be considered in evaluating the adequacy of a hearing.

We reject Fryer's initial contention that the voluntariness hearing was inadequate for the sole reason that it was held in the presence of the jury without Fryer's express consent. While "it certainly would have been prudent for the trial court to have asked whether [defendant's] counsel consented to the jury's presence," *Lufkins v. Solem,* 716 F.2d 532, 539 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984), the fact that the hearing was held in the presence of the jury does not by itself violate the Constitution. *See Pinto v. Pierce,* 389 U.S. 31, 88 S.Ct. 192, 19 L.Ed.2d 31 (1967).[7] In *Pinto,* the Supreme Court held that the challenged voluntariness hearing did not violate due

---

6. The record in no way supports Fryer's contention that his interrogation resembles the interrogation discussed in *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), where the police repeatedly refused to honor a suspect's declarations that he did not wish to talk, or his requests for an attorney. Fryer did allege for the first time in his post-conviction proceeding, six years after his conviction, that he had requested an attorney prior to making his statement. The post-conviction court found, based on police testimony, that Fryer made no such request. We note in this regard that the transcript of Fryer's statements reveals that Fryer

avowed his intent to speak despite being told of his right to counsel and his right to remain silent.

7. The Iowa Supreme Court held in *State v. Walton,* 247 N.W.2d 736, 740 (Iowa 1976), that under state law, an objection to the admissibility of a confession must be considered outside the presence of the jury. In *Fryer v. State,* 325 N.W.2d 400, 411 (Iowa 1982), however, the Iowa Supreme Court held that *Walton* did not apply retroactively to bar the admission of Fryer's confession.

process, though it was held in the presence of the jury, because "the respondent in this case *did not object* to having the voluntariness of his admission considered in the presence of the jury." *Id.* at 33, 88 S.Ct. at 193 (emphasis added).[8]

■ While we reject the contention that the presence of the jury in and of itself rendered Fryer's voluntariness hearing constitutionally inadequate, we are mindful of the fact that the presence of the jury can be a factor indicating the inadequacy of such a hearing, especially where, as here, defendant contends that the hearing was inadequate because he was unable to testify, present rebuttal evidence, or examine witnesses on the issue of voluntariness.

The actual hearing on the issue of voluntariness took place at trial and was rather brief. The prosecution sought to introduce Fryer's statement in connection with the testimony of police officer Allen Steinbeck. After the prosecution had briefly elicited facts from Steinbeck to lay a foundation for the introduction of Fryer's statement, defense counsel cross-examined Steinbeck. Steinbeck admitted on cross-examination that Fryer's statement was not given under oath, that Steinbeck did not himself type the statement, that police had interrogated Fryer until 3:30 a.m. prior to obtaining the statement, that Fryer had not eaten a meal prior to interrogation, and that Fryer had not been provided with an attorney prior to making his statement. Defense counsel thereupon objected to introduction of Fryer's statement.

The prosecution then reexamined Steinbeck. Steinbeck testified that Fryer had been advised of his constitutional rights,

had not wanted an attorney, that throughout the interrogation there had been breaks during which coffee and donuts had been served, and that Fryer had spent a considerable period of time the next day reviewing his transcribed statement before signing it. The trial court thereupon admitted Fryer's statement.

■ As mentioned previously, Fryer contends that the hearing he was afforded was inadequate because he was unable to testify, to present rebuttal evidence, or to examine other witnesses. We note, however, that neither Fryer nor his counsel indicated at trial that Fryer had anything to add to, or that he wished to dispute, the facts that had been elicited from Steinbeck. There was no indication that Fryer had any desire whatsoever to testify on the issue of the voluntariness of his confession, nor was there any suggestion that the defense felt that examination of any other person might indicate that the confession was involuntary. In short, defense counsel argued that Fryer's confession was involuntary on the basis of the undisputed facts presented by Steinbeck. While it is certainly clear that a defendant is entitled to testify on the issue of voluntariness if he so desires, and that it is error for a trial court to refuse to hear a defendant's offered testimony on the limited issue of voluntariness out of the presence of a jury, *see United States v. Carignan,* 342 U.S. 36, 38, 72 S.Ct. 97, 98, 96 L.Ed. 48 (1951), there is no showing in the present case that defendant actually wanted to testify on the issue of voluntariness, or was chilled in his desire to do so by the presence of the jury.[9] Thus, we con-

---

**8.** Fryer contends that because defendant's counsel in *Pinto* had consented to having the voluntariness hearing held in the presence of the jury, *Pinto* permits a voluntariness hearing to be held in the presence of the jury only if the defendant *consents* to such procedure, and not if the defendant merely fails to object. This position overlooks the language cited in the text, *supra,* as well as the concurring opinion of Justice Fortas in *Pinto:* "I concur in the result because of trial counsel's *consent* to the taking of evidence of voluntariness in the presence of the jury. Otherwise, I disagree." 389 U.S. at 33, 88

S.Ct. at 193. (Justice Fortas, concurring in the result) (emphasis added).

**9.** Fryer now asserts that he had been refused the right to counsel while being interrogated, though he had requested a lawyer, and that his voluntariness hearing at trial was inadequate because he could not present this allegation. Fryer did not make this contention until his post-conviction proceeding in 1980, approximately six years after his trial. As we have noted, Fryer did not dispute any facts on the issue of voluntariness. We do not believe the

clude that the hearing was not inadequate when judged by constitutional standards.

█ We note additionally, however, that even if the voluntariness hearing provided Fryer at trial had been constitutionally inadequate, Fryer's remedy would be not a new trial, but a remand to the District Court to allow the State a reasonable time in which to provide Fryer with an adequate hearing on the issue of voluntariness. *See Jackson v. Denno*, 378 U.S. at 395–96, 84 S.Ct. at 1790–91. If after such a hearing Fryer's statement were to be found voluntary, "the Constitution [would not] require[ ] a new trial." *Id.* at 395, 84 S.Ct. at 1790.

Fryer already has had an additional hearing on the voluntariness of his statement. In 1980, the Iowa District Court for Lyon County, after a lengthy post-conviction hearing during which Fryer had full opportunity to present evidence and to dispute facts, found Fryer's statement to have been voluntary. We are satisfied that the post-conviction hearing was fully adequate to determine the voluntariness of Fryer's statement. Thus, we cannot conclude that Fryer was deprived of a constitutionally adequate hearing to determine the voluntariness of his statement.[10]

## V.

Fryer next asserts that any of seven errors in the jury instructions require that he be granted a new trial. The Supreme Court of Iowa held that Fryer has waived these claims because no contemporaneous objection was made. *Fryer v. State*, 325 N.W.2d 400, 412 (Iowa 1982). In order to obtain habeas relief, Fryer therefore "must show both (1) 'cause' excusing his ... procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982). To show actual prejudice, Fryer must show that " 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.' " *Id.* at 169, 102 S.Ct. at 1595 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977)). We consider each asserted instructional error in turn.

### A.

Fryer initially contends that jury instruction 9 and jury instruction 11 each impermissibly established a mandatory presumption as to the element of intent necessary to convict him of first-degree murder. *See Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). We reject Fryer's contention. When read as a whole, the instructions clearly indicate that the jury was permitted, but not required, to draw inferences as to Fryer's intent.

█ The challenged instructions read as follows:

### INSTRUCTION NO. 9

Among the essential elements of murder in the first degree are deliberation, premeditation, and a specific intent to kill.

If a person with opportunity to deliberate makes a wrongful assault with a deadly weapon upon another and death ensues, the inference is warranted that he did so with malice, deliberation, premeditation and a specific intent to kill.

This inference is not conclusive, but may be considered by you with all of the evidence in the case, or lack of evidence, in determining whether or not the killing charged, if done by the defendant, was

hearing at trial subsequently was rendered inadequate because Fryer began to allege six years after trial that he did indeed dispute facts he made no attempt to dispute at the hearing.

**10.** Fryer objects to his post-conviction hearing on the ground that the police officer from whom Fryer claims he requested counsel was not available to testify. Another officer, who was with Fryer when the request was allegedly made, appeared at the post-conviction hearing and testified that Fryer had made no such request. The post-conviction court found that Fryer had made no request for an attorney.

done with deliberation, premeditation and a specific intent to kill.

## INSTRUCTION NO. 11

Malice aforethought is an essential element of the crime of murder. If a person makes a wrongful assault upon another with a deadly weapon and death ensues, the inference is warranted that such killing was with malice aforethought.

This inference is not conclusive, but may be considered by you with all the evidence in the case, or lack of evidence, in determining whether or not the killing charged, if done by the defendant, was done with malice aforethought.[11]

Fryer's argument is the same with respect to both instruction 9 and 11. First, Fryer contends that by reading the word "warranted" in the first paragraph of each instruction to mean "required," a juror could read the first paragraph of each instruction to require, with respect to instruction 9, an inference of deliberation, premeditation, and a specific intent to kill, and, with respect to instruction 11, an inference of malice aforethought with respect to instruction 11. Second, Fryer contends that the phrase "lack of evidence" in the second paragraph of each instruction could be taken by a juror to indicate that the mandatory presumption prescribed by the first paragraph could be overcome only if the defendant were to come forward with evidence and bear the burden of refuting the charge.

We do not share Fryer's construction of the instructions. While it may have been preferable for the trial court to have used the word "permitted" instead of the word "warranted," it is also apparent that the word "warranted" when used in the context here at issue is a synonym for the word "permitted" or for the word "justified" and not for the word "required." *See*

*generally* Webster's Third International Dictionary 2577–78 (1981). By reading the word "warranted" to mean "permitted," the resulting instructions are appropriate statements of the inferences permitted by law.

Two other jury instructions support our reading of the word "warranted." Instruction 6 informed the jury, in relevant part, that:

Circumstantial evidence is that which tends to establish a fact or facts, from which it may be reasonably and logically deduced that the main or ultimate fact exists which is thus sought to be proved.... In order, however, to warrant a conviction on circumstantial evidence alone, the facts proved must not only be consistent with the guilt of the accused, but they must also be inconsistent with any rational theory of his innocence, and all the facts and circumstances necessary to prove guilt must be connected with each other and with the main facts sought to be proved, that taken together they lead to a satisfactory conclusion that the crime charged was committed and that the accused committed it. It is not sufficient that they render probable the guilt of the accused, but they must exclude every reasonable hypothesis of his innocence.

Instruction 8 informed the jury that:

The intent with which an act is done, being a mental state or condition of the mind, is seldom if ever capable of direct and positive proof, but is to be arrived at by such just and reasonable deductions or inferences from the acts and facts proved as the guarded judgment of a candid and cautious person would ordinarily draw therefrom.

In determining the intent of any person you have a right to infer that he intended to do that which he voluntarily

---

**11.** Jury instructions 9 and 11 permitted the jury to infer the existence of malice aforethought, or premeditation and deliberation, or both, from the same acts. Instruction 5 defined "malice" as that condition of the mind that prompts one to do a wrongful act intentionally, without legal justification or excuse, without regard of human life. It further defined "to deliberate" as to weigh in one's mind or consider, and defined "to premediate" as to think or ponder before acting.

did, and that he intended the probable and natural consequences to follow his acts, voluntarily done, which ordinarily follow such acts.

Thus, the jury was told, in effect, that in determining intent, it had the right to draw such just and reasonable inferences from the facts proved at trial as a candid and cautious person exercising guarded judgment would draw. The jury was further instructed that while it may draw such inferences, it was not allowed to base a conviction on such inferences if it could draw from the facts proved any reasonable hypothesis of innocence.

We do not believe that any reasonable juror, after being twice instructed that he was permitted to draw inculpatory inferences, but could not convict if there was any reasonable exculpatory inference, would understand the word "warranted" in instructions 9 and 11 to require him to draw inculpatory inferences to the exclusion of exculpatory ones. Rather, we believe that any reasonable juror would have understood the instructions as a whole to complement, not contradict, each other,[12] would therefore have attributed to the word "warranted" its most common meaning, and would have understood that certain inferences as to intent were permitted, but not required.

### B.

■ Fryer also objects to instructions 9 and 11 on the ground that nothing in the evidence allowed the jury to find that Fryer had an opportunity to deliberate before the shootings. This assertion borders on the ridiculous. Fryer's statement indicates that Fryer and his brothers came across the teenagers in the park and believed them to have marijuana. The Fryers returned to their truck, got their weapons, returned to the teenagers' campfire, and, as Sandra Cheskey testified, jointly opened fire. The rest of the gruesome events of the evening soon followed. This is ample evidence to support an inference by the

jury that Fryer had the opportunity to deliberate before the shootings.

### C.

Fryer's third contention is that the aiding and abetting instruction given by the trial court omitted the essential element of knowledge, which is required as an element of aiding and abetting under Iowa law. The trial court instructed the jury (instruction 7) that:

To "aid" is to help, assist, support, promote the course of accomplishment of; help in advancing or bring about. To "abet" is to encourage, counsel, incite and instigate the commission of a crime.

■ The District Court held that these instructions made it necessary for the jury to find that Fryer acted knowingly with his brothers in order to find that he aided and abetted the murders. We agree. It would have been impossible for the jury to have found that Fryer acted unknowingly, yet helped, encouraged, counselled, and instigated the murders. Moreover, we note that given the evidence showing Fryer's leadership role in the gruesome events that occurred, we would find it impossible to say that omission of the word "knowledge" so infected the entire trial that the resulting convictions violate due process. *See United States v. Frady*, 456 U.S. at 169, 102 S.Ct. at 1595.

### D.

Fryer objects to instruction 25 on the ground that it improperly omitted the essential element of malice aforethought for felony murder. Instruction 25 reads as follows:

You will first determine whether the defendant is guilty of murder in the first degree, bearing in mind the definition of murder in the first degree and the definition of aiding and abetting heretofore given you in these instructions.

Before the defendant can be found guilty of the crime of murder in the first degree of any or all of the named dece-

---

12. Indeed, the jury was so instructed by instruction 37.

dents in the Information, the State must establish by the evidence beyond a reasonable doubt each of the following propositions:

1. That on or about November 17, 1983, in Lyon County, Iowa, the defendant did unlawfully shoot or aid and abet in the shooting of any or all of the named decedents in the Information.

2. That any or all of the named decedents died as a result of being shot by the defendant, or as a result of the defendant aiding and abetting in the shooting.

3. That such action of the defendant was done by him with malice aforethought and willfully, deliberately and premeditatedly and with a specific intent on the part of the defendant to kill any or all of the named decedents, or the aiding and abetting thereof by the defendant *or that any of them were killed during the defendant's commission of or attempt to commit a robbery*, or the aiding and abetting thereof by said defendant.

If the State has proved beyond a reasonable doubt all of the foregoing propositions then you will be warranted in finding the defendant guilty of murder in the first degree of the said named decedent or decedents above-named as the State has so proved beyond a reasonable doubt; but if the State has failed to prove any one or more of the said propositions beyond a reasonable doubt as they pertain to any of the above-named decedents, then you will find the defendant not guilty of murder in the first degree of the said decedent or decedents aforenamed as the State has so failed to prove; and you will then determine whether the defendant is guilty of the lesser and lower included offense of murder in the second degree of any and all of the abovenamed (sic) decedents of which said defendant has not been proved guilty of murder in the first degree. (Emphasis added).

At the time Fryer was tried, Iowa law required, to sustain a conviction of felony murder, that the death that occurs in the course of a felony be not merely an unlawful killing, but a murder; that is, the killing had to have been a killing with malice aforethought. *See State v. Galloway*, 275 N.W.2d 736, 738 (Iowa 1979). Fryer would have been entitled, had he objected, to have had the word "killed" in the felony murder portion of instruction 25 changed to "murdered" or to have had the words "with malice aforethought" inserted after the word "killed." *See id.*

We note initially, however, that instruction 11 clearly states (in relevant part) that "[m]alice aforethought is an essential element of the crime of murder," while instruction 13 states in defining first-degree murder, that, "[a]ll murder perpetrated or committed by willful, deliberate and premeditated killing of a human being [and] [a]ll murder committed in the perpetration or attempt to perpetrate or commit the crime of robbery is murder in the first degree." Thus, the instructions as a whole clearly indicate that conviction on *any* murder count, including felony murder, requires a finding of malice aforethought.

■ Second, even were we to find the instructions as a whole to be improper, we do not believe, when we examine "the degree of prejudice resulting from instruction[al] error ... evaluated in the total context of the events at trial," *United States v. Frady*, 456 U.S. at 169, 102 S.Ct. at 1595, that Fryer's convictions would violate due process. We note that there was more than sufficient evidence that on the evening in question, Fryer acted not only with malice aforethought, but in a willful, deliberate, and premeditated manner. *See United States v. Frady*, 456 U.S. at 171–72, 102 S.Ct. at 1596 (evidence of "malice aplenty" indicates no risk of a miscarriage of justice). Thus, we see no likelihood that Fryer suffered any actual prejudice because instruction 25 used the word "killed" instead of the word "murdered."

**E.**

Fryer also contends that instruction 25 is flawed because the third section of the

**992**

instruction permitted the jury to find him guilty of first-degree murder without requiring that the jury agree which criminal act he had committed.[13] He supports this argument by citing to *United States v. Gipson*, 553 F.2d 453 (5th Cir.1977). *Gipson* involved the direct appeal of a conviction under 18 U.S.C. § 2313, which provides criminal penalties for receiving, concealing, storing, bartering, selling or disposing of a stolen vehicle. At trial in *Gipson*, the district court had instructed the jury that the jury could convict the defendant, though the jurors did not agree on which of the acts covered by the statute the defendant had performed, as long as each juror found that defendant had committed one of the acts. The Fifth Circuit found the acts mentioned in the statute to be so dissimilar that the instruction given by the District Court violated the defendant's right to a unanimous verdict in his federal trial.

■ Although *Gipson* does superficially resemble the instant case, it really does not bear much resemblance in any significant sense. We note initially that in *United States v. Bolts*, 558 F.2d 316 (5th Cir. 1977), *cert. denied*, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1978), the Fifth Circuit limited *Gipson* to those instances where a district court has specifically sanctioned a non-unanimous verdict. The mere fact, however, that an instruction could conceivably permit a jury to reach a non-unanimous verdict is not sufficient to require reversal when the jury has been instructed that it must reach a unanimous verdict. *Cf. id.* at 326 n. 4. In the present case, it has not been alleged that the trial judge at any time told the jury that it was permitted

to reach a non-unanimous verdict, nor does a reading of the instructions reveal that the judge so instructed the jury. Moreover, instruction 42 specifically required a unanimous jury. "[A]bsent competent evidence to the contrary, a court has no reason to assume that [even] an inconsistent or compromise verdict is not unanimous, and therefore has no justification for inquiring into the logic behind the jury's verdict." *United States v. Gipson*, 553 F.2d at 457.

Second, we observe that *Gipson* was the direct appeal of a conviction from a United States District Court, where the defendant had objected in a timely manner to a charge to the jury that expressly sanctioned a non-unanimous verdict. The present case is a collateral appeal of the defendant's state court conviction. Thus, we do not review the record for simple error (or even for plain error), but only for actual prejudice.

■ The section of instruction 25 here objected to by Fryer essentially states that, to find Fryer guilty of first-degree murder, the jury had to find either that Fryer acted with malice aforethought, in a willful, deliberate, and premeditated manner, or that he acted during the commission or attempted commission of a robbery.[14] It has been noted that persons found guilty of felony murder could, as a general matter, usually have been convicted of murder without resort to the doctrine of felony murder. *See* Jeffries & Stephan, *Defenses, Presumptions, and Burden of Proof in Criminal Cases*, 88 Yale L.J. 1325, 1383 (1979). So it is in Fryer's case. There is certainly sufficient evidence that his crimes were premed-

---

13. Instruction 25 essentially told the jury that to find Fryer guilty of first-degree murder, it had to find beyond a reasonable doubt:

(1) that the defendant committed the act of unlawfully shooting, or aiding and abetting the shooting of any of the decedents;

(2) that the decedent died as a result of being shot by the defendant, or as a result of defendant aiding and abetting the shooting; *and*

(3) that the above-specified action of the defendant was done *either*

(a) with malice aforethought and in a willful, deliberate, and premeditated manner with the specific intent to kill any or all of the

decedents, or the aiding and abetting thereof, *or*

(b) during the commission of or attempt to commit a robbery by defendant, or the aiding and abetting thereof.

14. We note in passing that the section of instruction 25 objected to by Fryer on the basis that it did not require the jury to agree which criminal act he had committed appears to be the section of the instruction specifying the requisite *mens rea* for the crime of first-degree murder.

itated and deliberate so that we may confidently conclude that Fryer has not demonstrated that the instruction here at issue "worked to his actual and substantial disadvantage." *United States v. Frady*, 456 U.S. at 170, 102 S.Ct. at 1596.

### F.

Fryer next contends that he was denied due process of law because, though the jury instructions provided that he could be convicted of first-degree murder if he killed, or aided and abetted the killing of any decedent during the commission of a robbery or during an attempted robbery, and though the jury instruction contained a definition of robbery, the jury was never instructed as to what actions on the part of a defendant would constitute an attempted robbery.

Iowa law recognizes no independent crime of attempted robbery; the issue of what conduct on the part of a defendant constitutes an attempt arises in this case solely as a result of the Iowa felony-murder statute, which incorporates the concept of attempted robbery. In dealing with attempted crimes, Iowa recognizes the common law formulation of attempt that requires proof of (1) intent to commit the crime and (2) some act that goes beyond mere preparation for the crime and constitutes actual commencement of the crime. The latter requirement has been defined alternatively as "some act moving directly toward the commission of the offense after the preparations are made," *State v. Roby*, 194 Iowa 1032, 188 N.W. 709, 714 (1922), or as "slight acts in furtherance of the crime that render voluntary termination improbable," *Fryer v. State*, 325 N.W.2d at 406.

The Iowa Supreme Court concluded that no actual robbery had been committed by the Fryers since nothing had been taken from the possession of the victims. *Fryer v. State*, 325 N.W.2d at 406. The Court also concluded, however, that there was sufficient evidence in the record to indicate both that Fryer had the requisite intent to commit robbery, and that Fryer had completed acts in furtherance of the robbery

sufficient to render voluntary termination improbable. *Id.*

Fryer complains to this Court that, based on the finding that nothing was taken from the victim and based on the apparent lack of any intervening force to prevent consummation of the robbery, no reasonable conclusion can be drawn except that the robbery was voluntarily terminated. Fryer's position, then, is that the voluntary abandonment of an intended crime after the commission of acts in furtherance thereof, but before the crime is consummated, is an absolute bar to a finding that the actor engaged in an attempt. We believe that Fryer misconstrues the common law of attempts. The chief purpose of the requirement that there be a significant act in furtherance of the crime in order to impose liability for an attempt (aside from the general requirement that there be an act because criminal liability may not be premised on intent alone) is to corroborate the actor's specific intent to commit the crime. Thus, the act must be of such an unequivocal nature, in order to be a valid corroboration, that it would seem, at the time the act is committed, that voluntary termination is unlikely—that is, that the intent to commit the crime has generated an act (beyond mere preparation) calculated to bring the desired result to fruition. Once such an act is committed, the attempt is under way, and any subsequent termination, though voluntary, is not a defense.

We find support for this analysis in *People v. Dillon*, 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697 (1983). The defendant in that case had articulated a position identical to that here advanced by Fryer. That defendant relied on *People v. Buffum*, 40 Cal.2d 709, 256 P.2d 317, 321 (1953), which noted that to show an attempt, "[p]reparation alone is not enough, there must be some appreciable fragment of the crime committed, it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter...."

The California Supreme Court held in *Dillon* that the reference to interruption by

independent circumstances in *Buffum* did not mean that voluntary termination was a defense to the crime of attempt, but rather was merely a clarification of the requirement that the act in furtherance of the intent to commit the crime be unequivocal:

> If it is not clear from a suspect's acts what he intends to do, an observer cannot reasonably conclude that a crime will be committed; but when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is under way, and a last-minute change of heart by the perpetrator should not be permitted to exonerate him.

*People v. Dillon*, 194 Cal.Rptr. at 396, 668 P.2d at 703.

■ So it is, we believe, in Iowa common law. *Cf. Fryer v. State*, 325 N.W.2d at 406. The requirement that the act committed in furtherance of the crime be such that it render voluntary termination improbable does not enshrine a last-minute change of heart as a bar to a finding that an attempt was committed. Rather, such a requirement exists so that it is evident that the act committed be of an unequivocal nature: the act must be of such a nature that it is probable that the defendant intended to complete the crime. Once such an act is committed, the crime of attempt is complete, and later termination, though voluntary, is irrelevant. *See* Sayre, *Criminal Attempts*, 41 Harvard L.Rev. 821, 847 (1928).

■ More important, however, for the purposes of our present review, is that Fryer has not shown that the failure of the trial court to explain to the jury the elements of attempt worked to his actual and substantial prejudice. As previously noted, there is more than sufficient evidence to indicate that Fryer acted not only with malice aforethought, but in a willful, deliberate, and premeditated manner. *See*

*United States v. Frady*, 456 U.S. at 171–72, 102 S.Ct. at 1596. Fryer easily could have been convicted of first-degree murder without resort to the doctrine of felony murder. Thus, we see no substantial likelihood that the trial court's failure to define attempt prejudiced Fryer's chances with the jury.

## G.

Fryer also objects to instructions 21, 22, and 23, which stated that the prosecution must prove beyond a reasonable doubt either that Fryer inflicted a wound of a type likely to cause death on Michael Hadrath, Stewart Baade, and Dana Baade, respectively, or alternatively, must prove that Fryer aided and abetted in the infliction of such wounds. Fryer correctly points out that because uncontradicted testimony showed that Hadrath and the two Baades had not yet been fatally injured when Fryer left the park with Sandra Cheskey, there was no basis in fact for instructing the jury that it could find that Fryer inflicted a fatal wound on any of the three.

■ It does not appear to us that Fryer could possibly have been prejudiced by these instructions since, as we already have noted, there was sufficient evidence for the jury to have found, beyond a reasonable doubt, that Fryer aided and abetted the murders. Thus, we would reject this claim if it were properly before us. Because Fryer did not present this claim to the District Court, however, it may not be considered here for the first time. *See Van Meter v. Iowa*, 578 F.2d 218, 219 (8th Cir. 1978).

## VI.

■ Fryer claims that the prosecutor's questioning of the State's ballistics expert improperly drew attention to Fryer's failure to testify.[15] Fryer quite correctly

---

15. The prosecutor and the ballistics expert had the following colloquy at trial during redirect examination:

> Q Mr. Barton, just one thing. Would you tell us whether or not you could tell whether there had been shells picked up and removed from this area?
>
> A I would have no way of knowing that.

notes that it is error under *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), for a prosecutor to tell the jury that it may draw an adverse inference from the defendant's failure to testify. In *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), however, the Supreme Court declined to uphold the reversal of a conviction by the Court of Appeals in a case where the prosecutor had drawn attention to the fact that the defendants had not testified; the Court held that the error was harmless on account of the substantial evidence of guilt.

 We note again that we are not engaged in a direct review of Fryer's convictions, but rather are reviewing the District Court's dismissal of Fryer's collateral attack. Fryer's counsel did not object to the statements here contested and the Iowa Supreme Court held that the objection was waived. Thus, Fryer must show cause and prejudice in order to obtain collateral relief. He cannot demonstrate either. First, the District Court found that Fryer's counsel made a tactical decision not to object to the statement so as to avoid bringing further attention to Fryer's failure to testify. Thus, we do not believe that cause exists excusing Fryer's procedural default. Second, in light of the substantial evidence of guilt, and in light of the fact that the colloquy regarding the shells went to the issue of whether Fryer had actually fired the shot that killed Roger Essem,[16] we conclude that Fryer could not have suffered actual prejudice on account of the expert's testimony that Fryer would have known whether he had picked up any spent shotgun shells.

### VII.

Lastly, Fryer contends that the assistance provided by his trial counsel was ineffective (1) because counsel failed adequately to seek suppression of his statement to the police, (2) because counsel failed to object to the statement made by the State's ballistics expert, (3) because counsel failed to object to erroneous jury instructions, and (4) because counsel failed to request that closing arguments be transcribed. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held that in order to show ineffective assistance of counsel, a convicted defendant must show both: (1) that counsel's performance was seriously deficient, and (2) that the defendant was prejudiced by counsel's performance. *Id.* at 2064. In order to show prejudice under the *Strickland* test, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 2068.

As to the first claim of ineffective assistance raised above, we have already held that Fryer's statement was voluntary. For this reason alone, it cannot be said that Fryer was prejudiced by any alleged lack of effort on the part of his counsel to exclude it.

As to the second and third claims, we already have held that Fryer was not prejudiced by any alleged errors within the meaning of the cause and prejudice standard of *United States v. Frady:* there has been no showing that the testimony or instructions worked to Fryer's actual and substantial disadvantage. 456 U.S. at 170, 102 S.Ct. at 1595. Similarly, we reject Fryer's second and third abovelisted ineffective assistance claims on the ground that he has not shown sufficient prejudice under *Strickland.* He has shown nothing with regard to these claims that undermines our confidence in the outcome of his trial.

---

Q And could you state whether or not you know whether the defendant picked up and removed any shells from this area?
A I would have again no way of knowing this.
Q Who would know?

A The defendant, I would assume.
Trial Transcript at 272.

**16.** See the discussion in Part I of this opinion, *supra.*

Fryer's fourth claim of deficient performance by his trial counsel is that counsel provided ineffective assistance by failing to request a transcript of closing arguments.[17] Fryer now asserts that the prosecutor told the jury during closing arguments that if it found Fryer not guilty, the prosecutor wanted a two-day headstart to get out of town.

In a deposition submitted to the Iowa District Court for Lyon County in connection with Fryer's post-conviction hearing, Joseph Beck, who was an Assistant Attorney General for the State of Iowa, and was the prosecutor who Fryer alleges made the improper statement here at issue, denied making any such statement.[18] Furthermore, a newspaper article written about the closing arguments made no note of any such statement by Beck, though it did mention a number of other statements that had been made. See Deposition of Joseph Beck at 89–91. David Casjens, who was the second prosecutor at Fryer's trial, testified at Fryer's post-conviction hearing that he did not recall Beck making any such statement. Post-conviction Transcript at 393. Donald DeWaay, Fryer's trial counsel, was not asked at the post-conviction hearing about the alleged statement, but DeWaay did note that he would have objected to any argument made that would have prejudiced Fryer. Id. at 353. The record shows that no objections were made during closing argument. The post-conviction court found that no improper statement had been made by Beck during closing arguments. Appendix at 141.

A factual finding by a state court is generally presumed to be correct in a federal habeas proceeding absent specified procedural or substantive irregularities, and the burden is on the petitioner to show by convincing evidence that the state court factual determination is in error. See 28 U.S.C. § 2254(d). We have examined the record of Fryer's post-conviction hearing, and with respect to the factual determination here in question, we do not find any procedural or substantive irregularities within the meaning of § 2254(d). Fryer has not presented any convincing evidence that the post-conviction court erred in finding that Beck made no improper statement during closing arguments. As noted by the post-conviction court, Fryer's allegation that Beck did make such a statement is completely unsupported.

Accepting the finding of the post-conviction court that no improper statement was made during closing arguments, we cannot say that Fryer was prejudiced by the failure of his trial counsel to have closing arguments transcribed. See Strickland v. Washington, 104 S.Ct. at 2068. Thus, we reject Fryer's fourth claim of ineffective assistance of counsel.

The order of the District Court denying Fryer's petition for a writ of habeas corpus is affirmed.

---

**17.** Fryer's counsel apparently did not request that either voir dire or closing arguments be transcribed. Counsel testified at the post-conviction hearing that he did not recall anything during closing arguments that was objectionable, where an objection would have benefitted Fryer.

**18.** In his deposition, Beck flatly says that he made no such statement. See Deposition of Joseph Beck at 11. He later adds that as a prosecutor, "you just wouldn't say that. Why take a good case and screw it up?" Id. at 91.